## Commonwealth vs. Edward B. Martin.

Barnstable. February 7, 2006. - July 19, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Identification. Due Process of Law,* Identification. *Constitutional Law,* Identification. *Evidence,* Photograph, Intent. *Intent. Practice, Criminal,* Speedy trial. *Assault with Intent to Rape.*

This court concluded that the conditions surrounding a minor complainant's one-on-one showup identification of a criminal defendant did not render the identification so overly suggestive as to deny the defendant due process of law, whère the routine followed by the police (namely, a daily ritual of attempted identifications similar in nature, all of which the victim rejected until she made a positive identification of the defendant) ameliorated the suggestiveness of the criminal defendant's identification days after the incident; where the judge had an opportunity to assess the credibility of the victim at a hearing; and where, in the circumstances of the case, there existed good reason for the use of the showup method of identification. [278-284] Cordy, J., dissenting, with whom Marshall, C.J., and Ireland, J., joined.

A criminal defendant failed to demonstrate that a period of pretrial detention violated his constitutional right to a speedy trial. [284]

Error, if any, in the admission in evidence of a criminal defendant's unsevered and unsanitized mugshot did not create a substantial risk of a miscarriage of justice, given the powerful quality of other evidence at trial. [285-286]

Evidence at a criminal trial was sufficient to support the defendant's conviction of assault with intent to rape. [287-291]

Indictments found and returned in the Superior Court Department on August 16, 1994.

A pretrial motion to suppress evidence was heard by *Elizabeth J. Dolan,* J.; a motion to dismiss was heard by *Richard F. Connon,* J.; and the cases were tried before *R. Malcolm Graham,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*J. Thomas Kirkman,* Assistant District Attorney, for the Commonwealth.

*Edward J. DeAngelo* for the defendant.

*David M. Skeels*, Committee for Public Counsel Services, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

COWIN, J. This case requires the court to apply the principles applicable to one-on-one identifications to determine whether the defendant has proved that the showup here was "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny him due process of law. *Commonwealth* v. *Venios*, 378 Mass. 24, 27 (1979), quoting *Stovall* v. *Denno*, 388 U.S. 293, 301-302 (1967). We conclude that the defendant has not met this burden and that the admission in evidence of the showup identification procedure was therefore permissible. We further resolve the defendant's other claims of error against him and therefore affirm the convictions.

The defendant was indicted for assault with intent to rape a child under the age of sixteen years, assault with intent to kidnap, assault with intent to murder, and assault and battery. All the charges arose from an alleged attack on a fifteen year old girl on July 20, 1994. The defendant filed two motions before trial that are pertinent to his appeal: a motion to suppress the victim's identification of him and a motion to dismiss on speedy trial grounds, see Mass. R. Crim. P. 36, as amended, 422 Mass. 1503 (1996). Two different Superior Court judges denied these motions. Trial took place in August, 2001.[1] At the close of the Commonwealth's case the defendant moved for required findings on all the indictments but the assault and battery charge. The motion was denied. The jury convicted the defendant of all the offenses except for that of assault with intent to murder. The defendant appealed and the Appeals Court reversed the convictions on the basis that the identification procedure was overly suggestive. See *Commonwealth* v. *Martin*, 63 Mass. App. Ct. 587 (2005). We granted the Commonwealth's application for further appellate review.

1. *Motion to suppress.* The primary issue on appeal is the suggestiveness of the identification of the defendant and so we

---

[1]The case was first reached for trial in June, 1996, but a mistrial was declared because of the defendant's disruptive behavior. The defendant was then committed to Bridgewater State Hospital, and he was not found competent to stand trial until August 8, 2001.

set forth the evidence at the motion to suppress hearing as summarized in the judge's findings. Late morning on July 20, 1994, the fifteen year old victim left the beach in Yarmouth to return to her grandparents' house. As she walked along a dirt road that leads from the beach, she saw a man about ten feet away from her. Shortly thereafter, she was grabbed from behind and thrown to the ground on her back. She screamed as the attacker hit her in the face numerous times. He told her to "shut up" and tried to drag her into a bog area that bordered the path. The approach of another person caused the assailant to flee into the bog. The attack lasted approximately three minutes, during which time the victim had a "full frontal view" of her attacker's face.

Officer Richard White of the Yarmouth police department responded. He found a "shaken and upset" victim with an apparent injury below one eye. The victim informed Officer White and another officer of the attack and explained that she had a front view of the attacker during the assault. She described him as a white male, thirty to forty-five years old, tall and thin, wearing a light blue shirt with a green alligator on the chest. She also believed he must have been wearing shorts because she could see his legs. At a hospital, the victim repeated the same general description to another officer. She returned to the scene with the police, and amplified her original description by adding that the assailant wore a yellow hat, was tanned, "as if he had been out in the sun," and had thinning brown hair with a little gray in it.

At the Yarmouth police station, the victim assisted an officer in creating a composite. The police prepared a bulletin with the description provided by the victim and the bulletin and the composite were distributed to patrol officers and local merchants.

The victim was shown a number of "mug" books at the police station, but did not identify anyone as her assailant. Later, the police learned that the defendant's picture was among the photographs viewed by the victim, but it had been taken in 1992 and depicted a thinner man with a mustache and "scraggly" beard. The victim had described the assailant as having no facial hair.

The victim informed the police that she would be able to

identify her attacker if she saw him again. The Yarmouth police took her to different areas in Yarmouth and later in Hyannis where "persons within the age group of the assailant tended to congregate." During these rides along streets and beach areas, detectives and the victim stopped at least six times for the victim to view individuals who fit the general description. Twice, the person stopped was accompanied by uniformed police officers, although not in custody. The victim did not identify anyone during these viewings.

Early on the morning of July 25, the Yarmouth police were informed by the Barnstable police that they had stopped a person at Veterans' Beach who had been called to their attention by the victim's father. (The victim's father had been searching the area on his own for a person who matched the description and composite.)

On that same morning, the victim was at the Yarmouth police station preparing for another round of viewing when she was informed by a detective that "there was a suspect on the beach." The detective did not mention the victim's father. Detectives took the victim to Veterans' Beach where they drove through a "medium-sized" parking lot. They asked her to look "side to side" to see whether she recognized any of the many people in the parking lot. The defendant was at one end of the parking lot standing and talking with two uniformed Barnstable officers. He was not handcuffed or restrained. The victim saw her father a short distance from the three other men and realized at that point that her father must have alerted the police to this suspect. She had not known until then that her father would be present.

The detectives asked the victim to look at the man who was about fifteen feet away. She testified, "No one told me anything different than they had before and just asked me to look at this man." She tried "to put his face to the image that she had in her head," and asked to see him at closer view. When she did so, she recognized a mark on his head and told the police that he was the assailant. The showup lasted approximately seven minutes.

About seven hours after the showup, the victim was shown a photographic array at the police station. She was asked whether

she recognized her assailant and she pointed out the photograph of the defendant that had been taken earlier that day.

The judge considered whether the victim was influenced by trying to please her father by "validating" his choice of a person he thought matched the description. The judge also considered whether a fifteen year old girl was "afraid" to contradict her father's choice. In discussing these factors, the judge reviewed the conduct of the victim at the scene of the identification and her demeanor while testifying in court. The judge took into account the fact that the victim did not immediately identify the man she saw with her father and the police, but instead asked to see the man more closely before finally selecting him because of the mark on his forehead. The judge found the victim, sixteen years of age when she testified, to possess "poise and self-assurance beyond her years." She was "reasonably composed" considering that she was testifying in the presence of the man she believed to be her attacker. When questioned by the judge, she responded with candor and apparently without "being influenced by the authority figure of a judge." Despite pause for concern because of the victim's youth, her demeanor, and "certitude" in testifying led the judge to conclude that the victim was not a young woman likely to be influenced by an authority figure.[2] The judge concluded that "the aura of suggestibility" from the one-on-one identification was "dissipated by the totality of the actions of the victim" during the four-day period prior to the identification and denied the motion to suppress. We review to determine whether there was error. See *Commonwealth* v. *Whelton*, 428 Mass. 24, 25-26 (1998); *Commonwealth* v. *Acosta*, 416 Mass. 279, 284 n.1 (1993).

2. *Discussion relative to motion to suppress.* The victim identified the defendant at trial as the man who had attacked her on July 20, 1994. The defendant contends that the due process

_____

[2]The judge's observation as to the victim's "certitude" does not contravene the holding in *Commonwealth* v. *Johnson*, 420 Mass. 458, 465-472 (1995) (art. 12 of the Massachusetts Declaration of Rights requires per se exclusion of unnecessarily suggestive identification procedures without recourse to a secondary analysis of witness certainty or reliability). The observation about the victim's "certitude" is relevant only as a factor in the judge's analysis whether the young woman was susceptible to pressure from the presence of her father and his belief that this was a person who resembled the attacker.

clauses of the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights mandate the exclusion of the identification because of the impermissible suggestiveness of the identification procedure.

The Appeals Court noted that there is "some question" of the standard of review to be applied here; therefore, we shall address that issue. After the denial of the motion to suppress, the defendant did not object to the in-court identification at trial. Such an objection is not necessary to preserve appellate rights. A motion to suppress that rests on constitutional principles is reviewable without further objection at trial. See *Commonwealth* v. *Whelton, supra.* As the Commonwealth conceded at oral argument, the statement to the contrary in *Commonwealth* v. *Hill*, 38 Mass. App. Ct. 982, 982-983 (1995), is incorrect. We proceed to consider whether the motion judge erred in denying the motion to suppress. See *Commonwealth* v. *Whelton, supra* at 25.

One-on-one identifications are generally disfavored because they are viewed as inherently suggestive.[3] *Commonwealth* v. *Johnson*, 420 Mass. 458, 461 (1995). See *Stovall* v. *Denno*, 388 U.S. 293, 301-302 (1967). Nevertheless, we stated in *Commonwealth* v. *Austin*, 421 Mass. 357, 361 (1995), quoting *Commonwealth* v. *Harris*, 395 Mass. 296, 299 (1985):

> "[A] one-on-one pretrial identification raises no due process concerns unless it is determined to be *unnecessarily* suggestive. Whether an identification procedure is 'unnecessarily' or 'impermissibly' suggestive . . . involves inquiry whether good reason exists for the police to use a one-on-one identification procedure . . . bearing in mind that . . . '[e]xigent or special circumstances are not a prerequisite to such confrontations.' "

It is the defendant's burden to prove by a preponderance of

---

[3]The dissent devotes several pages to establishing this principle as if there is dispute about it. *Post* at 291-295 (Cordy, J., dissenting). There is no disagreement that suggestiveness is inherent in a one-on-one procedure. But that suggestiveness does not result in per se exclusion of identifications made during such showups. The suggestiveness merely means that we must proceed to the next step and consider whether the identification was unnecessarily or impermissibly suggestive. See *Commonwealth* v. *Austin*, 421 Mass. 357, 361 (1995).

the evidence that the showup was "so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny [him] due process of law." *Commonwealth* v. *Odware,* 429 Mass. 231, 235 (1999), quoting *Commonwealth* v. *Otsuki,* 411 Mass. 218, 232 (1991). "[B]ecause the issue before us is one of constitutional dimensions, the judge's findings of fact and rulings of law are open for reexamination by this court . . . . We properly leave questions of credibility for determination by the motion judge, as [s]he had the witnesses before [her]" (citation omitted). *Commonwealth* v. *Thinh Van Cao,* 419 Mass. 383, 384, cert. denied, 515 U.S. 1146 (1995).

The defendant faults the police for not asking him to agree to participate in a lineup or consent to be photographed. Failure of the police to pursue alternate identification procedures does not in itself render an identification unduly suggestive. The question is whether the police acted permissibly. The answer is not governed by the availability of another approach. Even if it were, the police here were dealing with a man walking in a beach area on a summer day and no evidence was presented that the defendant would have agreed to an alternate procedure or that he would not have fled during the time necessary to arrange one.[4] (The police clearly did not have enough evidence to compel the defendant to accompany them to the police station.[5])

"[S]howups of suspects to eyewitnesses of crimes have been regularly held permissible when conducted by the police promptly after the criminal event." *Commonwealth* v. *Bowden,* 379 Mass. 472, 479 (1980), quoting *Commonwealth* v. *Barnett,* 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977). As the judge found, the routine followed by the police in this

[4]There was evidence at the hearing that the defendant asked the police to allow him to leave the beach area where they had been detaining him.

[5]The defendant states that the police had previously photographed persons who resembled the description of the attacker and then showed the victim the photographs. Evidence of the use of such a procedure with other persons was admitted only at trial, however, and not at the motion to suppress. "Evidence adduced at trial but not before the motion judge . . . cannot be determinative of the propriety of the motion judge's decision." *Commonwealth* v. *Rivera,* 441 Mass. 358, 367 (2004), quoting *Commonwealth* v. *Ramos,* 402 Mass. 209, 216 (1988). Even had this evidence been timely presented, it would not have affected the outcome.

case ameliorated the suggestiveness of a one-on-one identification days after the incident. If the young victim had simply assisted the police on the day of the attack and not been contacted again until the day of the parking lot confrontation, the viewing would be considerably more suspect. However, the victim had been driving with the police during each of the intervening days and was continuously asked to look at persons who appeared to meet the description of her attacker. The police stopped with her at least six times to look at such people. In addition, at least two of these people were in the company of uniformed police officers. Given these facts, the confrontation with the defendant was one in a continuum of events, part of a "daily ritual of viewing" in the judge's terms. It was the equivalent of a continuous nonsuggestive lineup.

The dissent states that the evidence does not support the judge's finding of a continuous viewing; rather, the final confrontation was "different from most of the [previous] viewings." *Post* at 297 (Cordy, J., dissenting). The dissent also posits that without further findings, such as whether they stopped for the earlier viewings at the suggestion of one of the detectives or the victim, there is insufficient support for concluding that the contested showup was similar to the past ones. The judge's findings are adequate to determine that what occurred was permissible. The police drove the victim around a beach community for four days in July. She stopped at least six times to look at individuals and then rejected potential suspects each time. On two of these occasions, the "person stopped was in the company of uniformed police officers." It is irrelevant whether the cruiser stopped at the suggestion of the victim or a detective. What is relevant is that the victim rejected all the suspects until she made a positive identification. Given this sequence of events, together with the judge's opportunity to assess the credibility of the victim at the hearing, the judge could permissibly determine that the procedure was not unduly suggestive.

The defendant maintains, and the Appeals Court agreed, that the presence of the victim's father "present[ed] a real risk of suggestiveness." *Commonwealth* v. *Martin*, 63 Mass. App. Ct. 587, 593 (2005). The judge carefully considered this factor and

concluded, on her assessment of the victim's conduct at the scene (not identifying the defendant until she had a closer look at him and until she saw the mark on his forehead), and her "demeanor while testifying" ("candid and forthright" in responding to the judge's questioning and unbowed by interrogation from an authority figure), that the presence of her father did not render the identification suggestive. We are bound by the judge's determination of the credibility of the witness and, reexamining her conclusions of law, we agree with them. *Commonwealth* v. *Thinh Van Cao, supra* at 384. We conclude that, in these circumstances of a "daily ritual" of attempted identifications similar in nature to the final one, the identification was not unnecessarily suggestive.

There are two fundamental differences between the court's position and that of the dissent. First, we differ as to the meaning of *Commonwealth* v. *Austin,* 421 Mass. 357, 361 (1995). The court agrees that the *Austin* case requires that there be good reason for the use of a showup for identifying a suspect. The dissent appears to read the *Austin* case to require more than good reason for a showup to be justifiable: specifically, that the showup must be necessary. In this regard, it is the dissent, not the court, that alters the plain meaning of *Austin* and creates new law. The dissenters' position relies for much of its force on a mischaracterization of what the court has said. The dissent states that we have suggested a "multi-factorial test that might or might not take into account whether good reason for the particular showup existed." *Post* at 304 (Cordy, J., dissenting). We have not adopted a "multi-factorial test . . . that might not" include good reason. The *Austin* good reason test remains the touchstone of our analysis. We simply do not adopt the dissent's newly discovered requirement that showups take place only if necessary. Second, given our different approaches to what constitutes good reason, we inevitably reach opposite results on the facts of the case. While we conclude that the circumstances here established good reason for the procedure used, the dissent's conclusion that the showup here was impermissible is informed by its restrictive alteration of the *Austin* case, a view that we reject.

The dissent would have us alter the rules regarding showups

so that a showup is not permissible unless the police have "attempted to pursue, or even considered pursuing, readily available alternatives." *Post* at 307 (Cordy, J., dissenting). Only if such alternatives are unavailable would a showup be necessary. Although the dissenting justices imagine that such a rule was set forth in the *Austin* case, that case states simply that "[w]hether an identification procedure is 'unnecessarily' or 'impermissibly' suggestive . . . *involves inquiry whether* good reason exists for the police to use a one-on-one identification procedure." *Commonwealth* v. *Austin, supra* at 361. The dissent's narrowing of the concept of "good reason" so that a showup is permissible only if absolutely necessary, i.e., a means of last resort, alters the nature of the test and would impose a heightened requirement that has never been our rule.

The dissent concludes that the necessity of a showup is "linked to" police attempts to pursue other alternatives, such as the possibility that a suspect "will agree to a less flawed form of identification." *Post* at 307 (Cordy, J., dissenting). Yet, no case is cited where the court has required, as a precondition to a showup, that the police first explore the suspect's willingness to cooperate with some other method of identification. Whether the suspect will agree to some other investigatory technique has no role in an analysis whether a showup is unnecessarily suggestive.[6]

The dissent's desire that the court require a precondition of attempting other identification methods would impose on the process a best evidence rule that we have never demanded. The question is whether the procedure used was permissible, not whether an alternative would have been better. The precondition the dissent posits would constitute a restraint on the police that neither the Federal nor State Constitution requires. It would also impose on judges an obligation to determine in each case the best method of police investigation, a task for which few of us

---

[6]The dissent also ignores the fact that it is the defendant's burden to demonstrate that the showup was unnecessarily suggestive. *Commonwealth* v. *Odware*, 429 Mass. 231, 235 (1999). The defendant here made no showing that he was willing to accompany the police in order to participate in a lineup or to be photographed. Indeed, the only evidence on the issue was to the contrary: that the defendant asked the police to permit him to leave the beach area.

are suited by training, experience, or sources of information, and one that our legal system generally assigns to the executive branch of government. Likewise, were we to undertake such a responsibility, it would involve the court in a highly complicated process of fact finding likely to produce unreliable results. Such an eccentric vesting of unnatural and unnecessary authority in the judicial branch was never the intent of the *Austin* case, and we should not attempt to bring it about now.

Pursuant to the dictate of the *Austin* case, we have determined that good reason for the showup existed in this case. The procedure of having the victim, whom the police viewed as "a very good witness [who] . . . felt she could [identify the defendant]," drive with them to view all men in a geographically reasonable area was a sensible approach to a difficult investigative problem. The police could not bring into the station or photograph each man in the entire area who met the victim's description of her assailant. The police did the equivalent in a more efficient manner by canvassing the area in the company of the victim.

3. *Speedy trial.* The defendant contends that his right to a speedy trial was denied and claims violations of the Federal and State Constitutions and rule 36. The defendant raised these claims in a pretrial motion to dismiss that was denied. In reviewing the rulings on such motions, we give deference to the findings of the motion judge, but may reach our own conclusions. *Barry* v. *Commonwealth*, 390 Mass. 285, 289-290 (1983). The law governing such claims is clear. See, e.g., *Barker* v. *Wingo*, 407 U.S. 514, 530-533 (1972); *Commonwealth* v. *Lauria*, 411 Mass. 63, 67 (1991); *Commonwealth* v. *Edgerly*, 390 Mass. 103, 104 (1983); *Commonwealth* v. *Vasquez*, 55 Mass. App. Ct. 523, 529 (2002).

We agree with the Appeals Court that there was an "inordinately long period of pretrial detention," *Commonwealth* v. *Martin*, 63 Mass. App. Ct. 587, 598 (2005), and with its conclusion that "the majority of that period is [excluded for purposes of] rule 36, either because the defendant was responsible for [the] delays, because he consented to continuances, or because [the time was consumed during periods in which] he had been found incompetent to stand trial." *Id.* The judge did not err in denying the defendant's motion to dismiss.

4. *Mugshot.* The defendant claims that the form in which a mugshot of him was admitted at trial was erroneous. Specifically, he claims that the mugshot should have been severed (side and front views separated) and sanitized (to exclude from a label on the photograph his identifying information and the June, 1992, date). He also argues that the erroneous admission of the photograph was compounded by the lack of an instruction from the judge about the many reasons why the police may possess photographs of individuals. Acknowledging that there was no objection at trial, he contends that the jury's "struggle[]" with identification" indicates that there is a substantial risk of a miscarriage of justice. We review to determine whether there was error, and, if so, whether the error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Whitman*, 430 Mass. 746, 750 (2000).

The following evidence was relevant to the issue. A photograph of the defendant taken by the Yarmouth police two years before the incident was included in a photographic array shown to the victim the day following the attack.[7] The victim did not select the defendant's photograph. An unsevered mugshot, i.e., front and side views, identical to the one shown the victim, was introduced at trial. A label on the bottom of the page containing the mugshot states "Yarmouth Police Department" and contains identifying information about the defendant as well as a date two years before the incident.

During jury deliberations, the jurors sent a question about the identification testimony, a later note indicating they were unable to agree whether the defendant was the right person, a request for the definition of each charge, and finally, a report that they were deadlocked. After a charge in accordance with *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101-102 (1973) (Appendix A)[8] (which the jury later obtained in transcript form), the jury returned their verdicts.

---

[7] At trial, the victim testified that she looked through photographs the day of the attack. Two Yarmouth detectives testified that the victim first looked through photographs to see whether she could recognize her attacker among them the morning after the attack.

[8] The charge "is intended to be used when because of the lapse of time or otherwise the judge apprehends that the jury is deadlocked." *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 98 (1973).

Mugshots may be admitted in evidence where "[1] the prosecution shows some need for their introduction, [2] they are offered in a form that does not imply a prior criminal record, and [3] the manner of their introduction does not call attention to their source." *Commonwealth* v. *McAfee*, 430 Mass. 483, 493 (1999). The photograph here was probative evidence. Identification was the key issue at trial. The jury needed to see the photograph to understand why the young woman had failed to select it as a depiction of the defendant. The unsevered mugshot was necessary so that the jury could see the same photograph the victim had passed over. See *Commonwealth* v. *Richardson*, 425 Mass. 765, 766 (1997).

As to the second factor, avoiding implication of a prior record, the jury were already aware from the testimony that the police possessed a photograph of the defendant. The mugshot itself is only cumulative and adds nothing to that testimony. See *Commonwealth* v. *Murphy*, 426 Mass. 395, 403 (1998); *Commonwealth* v. *Capalbo*, 308 Mass. 376, 383 (1941). Any prejudice to the defendant arose from the existence of the mugshot, not from the information on the label. The photograph obviously was taken before July 20, 1994. In addition, the fact that the label on the reverse of the mugshot contains a date two years earlier indicates no more than that the photograph was taken at that time. There is nothing to suggest that it was taken in connection with an arrest rather than in relation to an application for a firearm, a taxicab license, or any other police business. While a limiting instruction to this effect could have been given, none was requested, and we do not require such an instruction without a request. *Commonwealth* v. *Richardson*, *supra* at 766-767. There was no error. Even had there been error, there was no substantial risk of a miscarriage of justice. Given the powerful quality of the evidence (the victim's identification at trial of the defendant as her attacker; testimony of a number of witnesses placing the defendant at or near the scene in the days before the crime; the fact that the defendant appeared to have been living in the area adjacent to the scene of the attack; and his written notes of a violent, sexual nature), any error in the admission of the mugshot (and we have discerned none), did not create a substantial risk that justice was not done.

5. *Motion for required findings.* The defendant's final claim is that the evidence was insufficient to support the offense of assault with intent to rape.[9] The defendant had filed a motion for required findings as to several of the offenses, including assault with intent to rape. In considering such a contention, we examine the evidence in its light most favorable to the Commonwealth to determine whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979). The Commonwealth may rely wholly on circumstantial evidence to establish the defendant's guilt. *Commonwealth* v. *Degro,* 432 Mass. 319, 325 (2000).

We summarize the evidence at trial with the above principles in mind. The testimony as to identification was essentially the same as that at the motion to suppress, see Part 1, *supra.* In addition, at trial the victim testified that, during the attack, the assailant tried to cover her mouth with his left hand which was wrapped in a white cloth and that during the attack his hat slipped back a little to reveal a "mark on his forehead." The victim testified that she was carrying a small pocketbook at the time of the assault, the attacker told her to "come with him" and, crying, she ran back to her family on the beach after the attack.

Eric Piasta was the person who approached when the defendant attacked the victim and caused the defendant to flee. Piasta and his wife had been walking down the path in front of the victim when Piasta heard the victim screaming and saw a man grab her from behind and "swing[] at her." Piasta saw the man drag the victim to the adjacent cranberry bog. Piasta ran toward them, yelling at the man to let her go. As Piasta got closer to the attack, he saw the assailant let go of the victim and run into the bog. He could see the man's face from the side and described him as wearing a yellow hat with "long straggly hair," blue shirt, shorts, and Nike sneakers. Piasta observed that the victim's bathing suit strap "was down on the side a little" and there was blood on her face. Piasta and another bystander

---

[9]The two elements of assault with intent to rape are an assault on the victim and a specific intent by the defendant at the time of the assault to rape the victim. See *Commonwealth* v. *Nickerson,* 388 Mass. 246, 253 (1983).

ran into the bog area looking for the attacker but were unable to find him.

Two days after the attack, a Yarmouth police detective returned to the bog area to search for evidence. He walked through an opening off the path where the attack occurred and down a road along the bog to an old sand pit. In the pit area, the detective saw a pair of blue cutoff shorts hanging from a tree, food items, a newspaper dated July 19, a plastic bag with blankets, a camouflage rain poncho, blue gloves, camouflage gloves, sunglasses, a novel, and plastic supermarket shopping bags. Photographs were taken and a few items were seized for fingerprinting, but most were left to see if anyone returned. A cloth diaper similar to the white cloth the victim had described as wrapped around her assailant's hand was also found near the victim's grandparents' house.

The defendant was arrested after he was identified by the victim at the Veterans' Beach showup. He gave the police a false name when he was arrested, and the police seized from him several items, including job applications, plastic shopping bags, clothing, camouflage gloves, a hat, a metal pipe, knives, duct tape, and handwritten notes containing violent sexual innuendos. The notes appeared frayed when they were found. On the day of the defendant's arrest, the police returned to the campsite at the sand pit and seized several things, including job applications with the defendant's name on them and a notebook. A witness trained in handwriting identification testified that it was "highly probable" that the job applications and notebook from the sand pit and the job applications and notes taken from the defendant at his arrest all were in the same handwriting. The notes seized from the defendant at his arrest and the contents of the notebook were read to the jury.[10]

Several witnesses identified the defendant at trial as the same

[10]The notes stated the following at various points: "Yarmouth beach, keep going, away down, stay out," "two blades, cut bitch, rope and blades, broken skull . . . crack the head and skull. Crack the head. . . . You C whore, you C whore, on back, or whatever. You will be a whore. Kiss, kiss on lips or mouth. Kiss on mouth. Great tongue. Yank out tongue. . . . Sex in five minutes. I want to — I want to — sex with you in five minutes. Tongue in mouth. Borrow tongue." "Rope to girl, rape. Both rape and date. Betsy ran. I track. I know you, but you don't know why. . . . Try me . . . Punch in face

man they had seen in the vicinity of the bog and beach area where the attack occurred. One such witness, Ann Azarian, was staying at her cottage across the street from the cranberry bog during the week of July 20, 1994. She was on the beach when the victim ran back to the beach after the attack. Azarian is a nurse and went to assist the victim. About one week later, Azarian saw an article in a local newspaper that contained a photograph of the defendant and stated that someone had been "captured that had done this." Azarian recognized the defendant as a person she had seen near the gate that leads into the cranberry bog and on the beach near the attack site.

Dennis Keeley, who owned a home in the beach area, saw the defendant's photograph in the local newspaper and identified the defendant in court as a person he had seen in the beach area prior to the attack. Another witness, Allen Thoresen, saw the defendant in a television report and identified the defendant as the same man he had seen in the vicinity of the beach in July, 1994.

Elias Patoucheas was yet another witness who lived near the beach. He moored a boat off that beach. On July 12, he was walking to his boat when he saw a man behind his dinghy wearing shorts, T-shirt, and sneakers. The man was holding plastic bags containing clothes and other items. Patoucheas spoke briefly with the man and saw the man again on July 19 (the day before the attack) emerging from the dirt path along the cranberry bog. After the attack, Patoucheas described the man he had seen to the police and picked a photograph of the

---

. . . Suck my dick." "[C]ylinder blocks, jump rope, grease the bitch. Ice the bitch. Grease the pretty bitch. Either one or any. . . . Karen what? Knew last name. Address? . . . ." "Rape sister . . . force, attempt." "One hammer or crowbar; one shovel, camouflage or bury cover; two, gloves, maybe prints; three, book any direction, wait five to ten minutes. Book any direction, towards school. Rural or woods. . . . Look for wood. Grab everything. Get everything. Need shovel, camouflage." "Gas can, rags, lighters, trash bag, gloves. Shovel, brush, cover up, camouflage. Check neighborhood. Best direction, book." Some entries in the notebook are as follows: "Two o'clock, blond bitch from Yarmouth, other direction. . . . 12:00 to 1:30. Brown hair, tied back. Went to lunch. 1:35, returned. There at 2:30. Left at 3:30. Security guard? 12 o'clock check, 1:00 o'clock check, red car, antenna, four-door, check out, back, side entrance, low two-door." "Know the area. Take time. Look around. . . . Take one good look around. Cut bitch or slice. . . . Get the fuck moving." "Big kiss, grab hair, tongue, neck, toes, naval [sic]."

defendant from an array. At trial, Patoucheas identified the defendant as the man he had seen on the beach and along the path.

Sarah Perry, a sixteen year old young woman testified to an encounter with the defendant on July 19. She was walking to the beach at about 5:30 P.M. on a road leading to a dirt road that goes to the beach. She saw a man in dark shorts, sneakers, and a yellow baseball cap run by her. One-half hour later, she again saw this man on the beach and he jogged away. About one hour later, when Perry was walking on the road home, she saw the same man approach her. At this time, he was wearing a T-shirt. He asked if she "had been getting any sun . . . enjoyed sports . . . [and her] name." He told her his name was "Ted or Ed." When they neared a dirt path, he asked if she "wanted to take the path." She refused; they continued walking along the road and he asked if she wanted "to go out with him to have a drink." When she declined and said she had to go, the man jogged away. Perry described the incident to the police, but could not pick the defendant from a photographic array shown her on July 25. She could not decide between two photographs, one of whom was the defendant. After leaving the police station, she saw the man who had approached her on a television report. She identified the defendant at trial as the same man she had met on July 19.

At the time of the above-described encounter, Lynne Duff was walking home from the beach area involved in this case with her two young daughters. One girl was about twenty-five feet ahead of her mother and sister on the path by the cranberry bog when a man came running toward her from a nearby road. Duff yelled to her daughter to stop and wait and the man ran by the mother into the bog. Duff described the man to the police as about five feet, eight inches tall with a thin build, wearing a T-shirt, jogging shorts, and a yellow baseball cap.

The defendant contends that there was insufficient evidence of his intent to rape the victim. His argument centers on the fact that nothing was said indicating a sexual intent, and that there was no evidence that the victim was touched "in a sexual manner," and no evidence of an attempt by the assailant to disrobe himself or the victim. While the defendant is correct in that

regard, the violent and sexual content of the notes, found on his person at the time of his arrest, are a powerful indication that the attack was sexual in nature. The sexual material in the notes is specific as to the defendant's intent and includes details of how to accomplish such a crime. Although there was no evidence when the notes were written, there was evidence that the notes appeared frayed, with the corners "ripped off" four days after the attack. The defendant argues that the "incoherent, disjointed nature" of the writings rendered them insufficient for the jury to infer any rational intent. The notes are sufficient to support a finding of an intent to rape, and the jury would be warranted in deeming them a shorthand expression of a plan.

The defendant also argues that in other cases we have suggested that the absence of evidence of larcenous intent has sufficed as a basis to permit an inference of intent to rape. He states that here there is no evidence of the absence of a larcenous intent. To the extent he suggests that this is an element of the offense or that its absence renders the evidence insufficient, that is incorrect. The jury may simply consider the absence of evidence of a larcenous intent. Even so, the victim testified that she was carrying a small purse and there was no evidence that it was taken or that the defendant made any attempt to remove it. Moreover, the victim was returning from the beach at the time she was attacked and it was unlikely that she would be carrying much of value in a small purse on the beach. In addition, the defendant attempted to drag the victim off the path into the bog area and told her to "come with him." The evidence was sufficient for submission of the offense in question to the jury.[11]

*Judgments affirmed.*

CORDY, J. (dissenting, with whom Marshall, C.J., and Ireland, J., join). Eleven years ago, in suppressing a suggestive one-on-

---

[11]Although the defendant contended before the Appeals Court that there was insufficient evidence to warrant a finding of intent to kidnap and although the Commonwealth refers in its brief to such an argument, the defendant's brief to this court contains no reference to such an issue.

one identification remarkably similar to the one at issue here, we observed that "the danger of mistaken identification by a victim or a witness poses a real threat to the truth-finding process of criminal trials. Indeed, mistaken identification is believed widely to be the primary cause of erroneous convictions. . . . Compounding this problem is the tendency of juries to be unduly receptive to eyewitness evidence." *Commonwealth* v. *Johnson*, 420 Mass. 458, 465 (1995) (*Johnson*). The court went on to note that the "admission of an identification obtained through unnecessarily suggestive procedures can only serve to exacerbate this problem," *id.* at 467, and that these dangers "require the utmost protection against mistaken identifications." *Id.* at 465. Evidence accumulated during the decade since we decided the *Johnson* case confirms that those observations were well founded.

Prior to the 1990's, psychological literature and studies were the principal sources of skepticism about the reliability of eyewitness identification. For at least one-quarter of a century, leading psychologists in the field had warned the criminal justice system regarding the problems of such identifications and of the suggestive procedures often used to secure them. While the experimental findings of psychologists seemed compelling, it was not until the 1990's that the criminal justice system began to take such findings seriously. It is not coincidental that this deepening interest paralleled the increasing use, refinement, and acceptance of DNA (deoxyribonucleic acid) evidence. As powerful a tool as DNA evidence was to become in securing convictions of those who were guilty, it was an equally powerful tool for reexamining the convictions of persons who were in fact innocent. The ability authoritatively to exonerate such persons (even in the relatively small number of criminal cases where DNA was collected, preserved, and proved dispositive) provided an extraordinary opportunity to identify and study the mistakes that had led to the conviction of the innocent, and the corresponding escape of the guilty.

This opportunity was embraced and pursued by researchers and the defense bar alike,[1] and led to an increase in eyewitness identification case studies and recommendations for reform in

[1]The Innocence Project, for example, was established in 1992 for the

the criminal justice system.[2] Even the United States Department of Justice, through its National Institute of Justice, became fully engaged after 1996 in studying the scope of the problem of misidentification through the appointment of an extraordinary working group of prominent law enforcement experts, scientists, prosecutors, and defense attorneys.[3]

Much has been learned from these efforts. Of the first 163 exonerations secured through the use of DNA evidence, for example, we know that seventy-seven per cent of the convictions were the product of mistaken eyewitness identifications.[4] There is no longer any doubt that mistaken eyewitness identification is the primary cause of erroneous convictions, outstripping all other causes combined, and that suggestive identification procedures are the primary cause of mistaken identifications.

Armed with the irrefutable data accumulated since the *Johnson* decision, the court now, inexplicably, takes a significant step backward in our jurisprudence regarding one-on-one identifications arranged by the police (showups), opening the door to certain error in the future.[5] Rather than ensuring "the

purposes of both assisting in securing freedom for the wrongly convicted and serving as a clearinghouse for information about such cases — tracking, documenting, and analyzing them from a systemic perspective.

[2]See, e.g., Lee, No Exigency, No Consent: Protecting Innocent Suspects from the Consequences of Non-Exigent Show-ups, 36 Colum. Hum. Rts. L. Rev. 755 (2005); Steblay, Eyewitness Accuracy Rates in Police Showup and Lineup Presentations: A Meta-Analytic Comparison, 27 L. & Hum. Behav. 523 (2005); Wells, Eyewitness Testimony, 54 Ann. Rev. Psychol. 277 (2003); Collins, Improving Eyewitness Evidence Collection Procedures in Wisconsin, 2003 Wis. L. Rev. 529; Warden, How Mistaken and Perjured Eyewitness Identification Testimony Put 46 Innocent Americans on Death Row, Center on Wrongful Convictions, Nw. L. Sch. (2001); Eyewitness Identification Procedures, 22 L. & Hum. Behav. 603, 605 (1998); Wells, "Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts their Reports of the Witnessing Experience, 83 J. Applied Psychol. 360 (1998); Lindsay, Simultaneous Lineups, Sequential Lineups, and Showups, 21 Law & Hum. Behav. 391 (1997). See also *State* v. *Dubose*, 285 Wis. 2d 143 (2005).

[3]United States Department of Justice, Eyewitness Evidence: A Guide for Law Enforcement (1999); United States Department of Justice, Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial (1996).

[4]Mistaken Eyewitness Identifications, The Innocence Project (2006).

[5]We need not look beyond our own borders for evidence of wrongful convictions based on suggestive one-on-one showups. In *Commonwealth* v.

utmost protection[s]" against misidentification and the suggestive procedures that too often produce them, the court substantially weakens the protections we have already put in place. Because I conclude that the identification procedure used initially to identify the defendant in this case was unnecessarily suggestive and should have been excluded at the trial, and that its admission in evidence was prejudicial in the context of what occurred at that trial, I respectfully dissent.

*Discussion.* Our court has consistently maintained that the due process clause of art. 12 of the Massachusetts Declaration of Rights requires suppression of identifications that are the product of unnecessarily suggestive procedures. *Commonwealth* v. *Odware*, 429 Mass. 231, 235 (1999) ("If a defendant establishes that [an identification procedure] was unnecessarily suggestive, then the identifications are excluded . . ."); *Commonwealth* v. *Botelho*, 369 Mass. 860, 866 (1976) (where defendant shows witness subjected to identification procedure "that was unnecessarily suggestive, and thus offensive to due process," prosecution barred from introducing identification because "there is a 'per se' exclusion"). We have also consistently ruled that one-on-one identifications employed by the police are "inherently suggestive" and thus "generally disfavored." *Commonwealth* v. *Thompson*, 427 Mass. 729, 735, cert. denied, 525 U.S. 1008 (1998). See *Stovall* v. *Denno*, 388 U.S. 293, 302 (1967) (practice has been widely condemned), overruled in part on other grounds, *Griffith* v. *Kentucky*, 479 U.S. 314 (1987).

In *Johnson*, we declined to trade our demanding test for the admission of inherently suggestive one-on-one identifications for the more relaxed "reliability test" adopted by the United States Supreme Court in *Manson* v. *Brathwaite*, 432 U.S. 98

*Leaster*, 395 Mass. 96, 102-104 (1985), for example, we held that a showup identification made by the wife of a robbery and murder victim, in the parking lot outside a hospital, ninety minutes after the shooting, was not unnecessarily suggestive, and was therefore properly admitted in evidence. The witness was certain that Leaster was the shooter (whom she observed for three minutes during the robbery), because of the "mark under his eye" that she pointed out at the showup. After serving fifteen years in prison, Bobby Joe Leaster was exonerated of the crime. Charles Kenney, Justice for Bobby Joe, The Boston Globe Magazine (Feb. 28, 1988), at 15.

(1977) (*Brathwaite*). See *Johnson, supra* at 465. We rejected the *Brathwaite* test, which permitted an unnecessarily suggestive identification to be admitted in evidence if it was nevertheless found to be "reliable," because we concluded that such a test "provide[d] little or no protection from unnecessarily suggestive identification procedures, from mistaken identifications and, ultimately, from wrongful convictions." *Id.* at 466. Today's decision erodes the test we insisted on in *Johnson*, suffers from the defects we pointed out in rejecting the *Brathwaite* decision, and risks similar results.

To the extent our jurisprudence on the subject needs further clarification, we should affirm that a showup is "unnecessarily suggestive" and violates due process unless a "good reason exists for the police" to use it as an identification procedure. *Commonwealth* v. *Austin*, 421 Mass. 357, 361 (1995) (*Austin*). The court's opinion, however, succeeds only in muddying jurisprudential waters that should remain clear. It does so by recharacterizing what was clearly a showup (and therefore "inherently suggestive") as the equivalent of a "continuous nonsuggestive line up," *ante* at 279, 281; essentially eviscerating the holding in *Austin* that a "good reason" must exist to conduct an inherently suggestive one-on-one showup; implying that a showup conducted five days after the assault may have been in the immediate aftermath of the crime; placing no burden on the police even to consider the use of less suggestive procedures, if a showup happens to be convenient; and suggesting that the reliability of the witness is indeed a factor to be weighed in determining whether a showup identification is "unnecessarily" suggestive, a proposition we specifically rejected in *Johnson*.[6]

1. *The showup.* The court, remarkably and without citation, reasons that the showup in this case was, in essence, not a showup at all. The court maintains that "the confrontation . . . was one in a continuum of events, part of a 'daily ritual of viewing,' " and thus "the equivalent of a continuous nonsuggestive lineup." *Ante* at 281. This conclusion, it appears, is the

---

[6]The reliability of the witness, of course, may still be relevant to the question whether a subsequent identification has a source independent of the suggestive one and therefore may be admitted. See *Commonwealth* v. *Johnson*, 420 Mass. 458, 476 & n.5 (1995) (Nolan, J., dissenting) (*Johnson*).

principal basis for the court's validation of the challenged showup. See *ante* at 282 ("We conclude that, in these circumstances of a 'daily ritual' of attempted identifications similar in nature to the final one, the identification was not unnecessarily suggestive"); *ante* at 284 (police had good reason to take victim to view suspects because they could not bring all suspects to the police station or take their photographs).

To support its continuous lineup theory, the court relies on the motion judge's following findings: the police and the victim "cruised the streets and beach areas" for the four days between the incident and the showup; they "stopped at least six times to view individuals fitting the general description [of the assailant]; "[o]n two of these occasions, the person stopped was in the company of uniformed police officers" and "the locus and procedure [of the contested showup] were not significantly different from what had become a daily ritual of viewing on the part of the victim."[7]

Before today, this court has on no occasion concluded that a showup was not inherently suggestive because it had been preceded by other showups.[8] Such a conclusion turns our jurisprudence on its head. It will, quite naturally, encourage (rather than discourage) the routine holding of multiple showups, in order to increase the probability that a successful one will pass constitutional muster. Indeed, it is unclear how,

---

[7] The Superior Court judge had not equated the showup with a nonsuggestive lineup.

[8] The only case that would tangentially support this conclusion is *Commonwealth* v. *Venios*, 378 Mass. 24 (1979). In that case, a witness was shown two photographic arrays (one of two dozen persons and one of 150 persons) one day, and one additional photograph the next morning. He identified the man in the last photograph as the perpetrator. The court concluded that the "showing of one more photograph the next morning 'was to some extent a continuation of an ongoing process of looking through police photos.' " *Id.* at 29, quoting *Nassar* v. *Vinzant*, 519 F.2d 798, 801 (1st Cir.), cert. denied, 423 U.S. 898 (1975). This case, involving photographs, not live confrontations, provides scant support for the court's proposition. See *Commonwealth* v. *Martin*, 64 Mass. App. Ct. 1108 (2005) (unpublished memorandum and order) (where photographs shown to witness one at a time in continuous session, one-on-one confrontation cases inapplicable because "presentation of a photographic array does not implicate the kind of concerns that have led our courts to characterize such in person . . . show-ups as 'generally disfavored' ").

after this decision, we can continue to declare that showups are generally disfavored in the Commonwealth. The number of persons the victim viewed and rejected, whether as part of a photographic array, random drive-by viewings, or other showups, does not alter the essential, inherent suggestiveness of the one-on-one confrontation between the victim and the defendant at which the identification was made, and certainly should not be considered to provide the police with "good reason" to justify an even more suggestive showup.[9]

Moreover, the facts in this case simply do not support the conclusion that the challenged showup was not significantly different from what had become a daily ritual of viewing on the part of the defendant. On that morning, the victim arrived at the police station to embark on another drive-by viewing trip. Instead, she was told "there was a suspect on the beach," and was driven to that location by detectives. In the beach parking lot, the unmarked cruiser pulled up to and stopped by the defendant, who was talking with two uniformed police officers and near whom stood the victim's father. The victim was aware that her father had been looking for the perpetrator, and when she saw him with the police and the defendant, assumed that he had been the person who had picked the defendant out and notified the police. The detectives asked the victim to look at the defendant. After the defendant was moved closer for a better view, she recognized him from a distinctive mark he had on his face, a mark that she had not previously mentioned to the investigating officers or the police sketch artist. The showup lasted approximately seven minutes.

Clearly, this confrontation was different from most of the viewings the victim had participated in during the previous four days, where she looked for her attacker out the window of a moving police cruiser among persons in the general population. While the judge found that during this four-day period, "the detectives and [the victim] stopped at least six times to view

---

[9]Contrary to the court's suggestion, *ante* at 280-281, drive-by viewings of persons in the general population of a community by a victim accompanied by police are not the same as showups, and are not generally viewed as inherently suggestive. They become so when the police drive a victim to view a specific person who has been identified as a suspect, and proceed to stage a one-on-one confrontation.

individuals fitting the [attacker's] general description," there are no further findings regarding the majority of these stops: whether they occurred at the victim's request (because she saw someone at whom she wanted to take a closer look), or at the suggestion of the detectives with whom she was riding (for similar reasons), or in response to other police officers' calling in the location of a person fitting the general description of the attacker.[10]

On two of these six occasions, the judge found that the "person stopped was in the company of uniformed police officers." Assuming that this finding supports the conclusion that on these occasions the detectives and the victim responded to sightings by other officers,[11] and arrived and proceeded in a manner similar to the beach showup, this only occurred twice in four days. Two showups (of undetermined nature and length) in four days does not constitute a "daily ritual" of viewings similar in type and procedure to the showup at issue here.

Most important, the showup with the defendant was the only time that the fifteen year old victim viewed a suspect whom she believed her father had previously identified. It was also the only time she had viewed a suspect in his presence. Although the judge eventually concluded that the presence of the victim's father was not fatal to the showup, she never suggests, nor is it

---

[10]The court deems the lack of information regarding the drive-by viewings to be "irrelevant." *Ante* at 281-282. Instead, it suggests that "what is relevant is that the victim rejected all the suspects until she made a positive identification." *Ante* at 281. This entirely misses the point. That the victim rejected all previous suspects tells us next to nothing without specific evidence as to the circumstances surrounding those prior nonidentifications and their similarity to or difference from the showup in which she identified the defendant. Certainly (or at least hopefully), if the victim had spent the four days prior to the showup combing through police photograph books, the court would not suggest that her rejection of suspects she "viewed" bears on whether the showup was unnecessarily suggestive. That the drive-by viewings here may be more similar to the contested showup than viewing photographs at a police station, in no way makes "irrelevant" the question whether the drive-by viewings were similar enough to the showup to convert such a procedure into one that is not disfavored in this Commonwealth. In any event, the victim's rejection of prior suspects is a completely irrelevant consideration in the determination whether a showup was unnecessarily suggestive.

[11]In her testimony, the victim made clear that "other times" they had "gone to view suspects," and that the detectives had made statements similar to "there's a suspect" at some location.

reasonable to assert, that the father's presence did not make this showup different from the viewings that had taken place on previous days.

The showup at issue here should be treated no differently from every other showup that this court has considered. It was inherently suggestive, and we should thus turn to the more relevant question whether it was unnecessarily so.

2. *The good reason requirement.* In *Austin, supra* at 361-362, we outlined the test governing the constitutionality of one-on-one identifications:

> "Such showup identifications are disfavored because they are viewed as inherently suggestive. See *Commonwealth* v. *Johnson, supra* at 461; *Commonwealth* v. *Santos,* 402 Mass. 775, 781 (1988). See also *Stovall* v. *Denno,* 388 U.S. 293, 301-302 (1967), overruled in part on other grounds, *Griffith* v. *Kentucky,* 479 U.S. 314 (1987). Nonetheless, a one-on-one pretrial identification raises no due process concerns unless it is determined to be unnecessarily suggestive. Whether an identification procedure is 'unnecessarily' or 'impermissibly' suggestive, see *Commonwealth* v. *Thornley,* 406 Mass. 96, 98-99 (1989), involves inquiry whether good reason exists for the police to use a one-on-one identification procedure, see 1 W.R. LaFave & J.H. Israel, Criminal Procedure § 7.4 (b), at 581 (1984), bearing in mind that this court has said that '[e]xigent or special circumstances are not a prerequisite to such confrontations.' *Commonwealth* v. *Harris,* 395 Mass. 296, 299 (1985). See *Commonwealth* v. *Barnett,* 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Coy,* 10 Mass. App. Ct. 367, 371 (1980).
>
> "Relevant to the good reason examination are the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track. *Commonwealth* v. *Barnett, supra.* The analysis cannot be generalized. Each case must be resolved on its own peculiar facts, considering as well

that the existence of 'good reason' presents a question of law for the appellate court to resolve on the facts found by the motion judge. See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 538-539 (1990); *Commonwealth* v. *Barnett*, *supra* at 91."

The court cites, in large part, these same passages in its opinion. Unfortunately, it then essentially ignores *Austin*'s requirement that the police have a "good reason" to hold a showup.[12] Even when the court finally discusses "good reason," it so broadens the concept as to only exclude completely arbitrary showups performed for no reason at all. The court does so by shifting the focus of the good reason requirement from the particular showup at issue to the over-all investigatory procedures the police used that led to the showup. As a result, the court appears to transform "good reason" from a significant precondition for an inherently suggestive and disfavored showup to simply one less than rigorous factor to be considered in determining its constitutionality.[13] This novel,[14] and ultimately unpersuasive reading of *Austin*, would allow (and, again, certainly not discourage) the use of showups in the absence of any "good reason" to do so.[15]

---

[12]Tellingly, the principal portion of the court's opinion does not mention "good reason." Rather, the court's brief allusion to good reason comes only after it has already concluded that the showup was permissible and seems only grudgingly offered in response to the dissent.

[13]The court cites no case as authority or even support for its new interpretation of *Commonwealth* v. *Austin*, 421 Mass. 357 (1995) (*Austin*).

[14]The court today seems to adopt the position espoused by the dissent in *Austin*, which faulted the majority for analyzing whether good reason existed to justify the police showup. See *id.* at 368, quoting *Commonwealth* v. *Thornley*, 406 Mass. 96, 98-99 (1989) (O'Connor, J., dissenting) ("The question before the court . . . is not 'whether good reason exists for the police to use a one-on-one identification procedure' as the court . . . suggests," rather, "[t]he question is whether [the procedure] was 'so impermissibly or unnecessarily suggestive and conducive to irreparable misidentification as to deprive the defendant of his due process rights").

[15]The court warns that a true "good reason" requirement would be an "eccentric vesting of unnatural and unnecessary authority in the judicial branch." *Ante* at 284. I could not have crafted a better description of the now standardless, multi-factorial, free-floating totality of the circumstances test that the court foists on our jurisprudence. Today's decision seems to replace the search for "good reason," and its traditional factors, with a wholly subjective totality

As the court concedes, *Austin, supra* at 361, stated that "[w]hether an identification procedure is 'unnecessarily' or 'impermissibly' suggestive . . . involves inquiry whether good reason exists for the police to use a one-on-one identification procedure . . . ." *Ante* at 283. This sentence follows *Austin*'s acknowledgment that showups are "inherently suggestive," coupled with a reminder that the procedure only violates due process if it is "*unnecessarily* suggestive" (emphasis in original). Quite clearly, the sentence cited by the court explains that the difference between a suggestive showup and an unnecessarily suggestive showup is "whether good reason exists for the police to use" the procedure. This is only logical. If there is no good reason to hold a showup, such a procedure is unnecessary. If an inherently suggestive procedure is unnecessary, it is unnecessarily suggestive. Certainly, our landmark case in this area supports this view. See *Johnson, supra* at 471, quoting *Brathwaite, supra* at 128 (Marshall, J., dissenting) (rejecting Federal reliability test because "[b]y relying on the probable accuracy of a challenged identification, *instead of the necessity for its use*, the Court seems to be ascertaining whether the defendant was probably guilty" [emphasis added]).

Moreover, the support for the good cause requirement adopted in *Austin* comes from 1 W.R. LaFave & J.H. Israel, Criminal Procedure § 7.4(b), at 581 (1984). In § 7.4(b), the authors explain how to determine whether any identification procedure is unnecessarily suggestive. The "inquiry can . . . be broken down into two constituent parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." They continue: "Assuming suggestive circumstances" (the court here concedes, as it must, that one-on-one identifications are inherently suggestive), "the question then is whether they were impermissible or unnecessary." This inquiry turns on whether there was some articulable need to hold a showup. See *id.* at 581-582 (describing this part of the test as

of the circumstances determination as to whether a particular method of police investigation that led to an inherently suggestive showup was a "sensible approach" (*ante* at 284) taking into account the reliability and credibility of the witness and other unnamed and unexplained factors.

the "*Stovall* necessity" test).[16] Citation to this source confirms that *Austin*'s language was meant to conform to the prior jurisprudence requiring police to have a specific good reason before holding a particular showup.[17]

The remainder of the *Austin* decision also stands in stark contrast to the court's diminishment of the good reason requirement. Immediately after introducing the good reason test, as explained above, *Austin* lists the factors "relevant to the good reason examination[:] the nature of the crime involved and the corresponding concerns for public safety; the need for efficient police investigation in the aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track." *Austin*, *supra* at 362.

[16]This section of the treatise explained the pre-*Brathwaite* Federal constitutional test for the validity of identification procedures. In *Commonwealth* v. *Johnson*, 420 Mass. 458, 462-463 (1995) (*Johnson*), we rejected the Federal standard announced in *Manson* v. *Brathwaite*, 432 U.S. 98 (1977) (*Brathwaite*), and held that we would continue to adhere "to the stricter rule . . . previously followed by the Supreme Court and first set forth in the [*United States* v. *Wade*, 388 U.S. 218 (1967), *Gilbert* v. *California*, 388 U.S. 263 (1967), and *Stovall* v. *Denno*, 388 U.S. 293 (1967), overruled in part on other grounds, *Griffith* v. *Kentucky*, 479 U.S. 314 (1987),] trilogy of cases."

[17]This reading of *Austin* appears to be the one we followed in *Commonwealth* v. *Thompson*, 427 Mass. 729, 735-736, cert. denied, 525 U.S. 1008 (1998). In that case, we quoted the two paragraphs from *Austin* set forth *supra* at 299-300, and then explained that the "identifications . . . were justified because they constituted parts of an efficient police investigation in the immediate aftermath of a crime." *Id.* at 735. We then proceeded to explain why the officers had good reason to hold a showup. "[O]fficers found two handbags and a wallet in the car [occupied by two men], suggesting that they were loot from recent robberies. The officers checked whether there had indeed been such robberies, and were informed about the Brookline incident, which had occurred just one hour before. The identification procedure allowed the officers to establish a connection between the stolen goods and the men, and provided [the victims] a good opportunity to view suspects while their recollections were fresh." Based solely on its conclusion that the police had good reason to hold the showup, the court concluded that "the defendant failed to . . . show[] . . . that the identifications . . . were unnecessarily suggestive." *Id.* at 736.

Similarly, this reading has been followed in the trial court. See *Commonwealth* vs. DelRio, Essex Superior Court No. ESCR2002-0647 (April 29, 2003), citing *Austin*, *supra* at 361 ("Determining whether a show-up is unnecessarily suggestive *must* include an inquiry into whether good reason existed for the use of the show-up" [emphasis added]).

Not surprisingly, these factors are precisely those which our courts have traditionally taken into account in passing on the constitutionality of a showup. See, e.g, *Commonwealth* v. *Thompson*, 427 Mass. 729, 735 (1998); *Commonwealth* v. *Barnett*, 371 Mass. 87, 92 (1976); *Commonwealth* v. *Bumpus*, 354 Mass. 494, 501 (1968), cert. denied, 393 U.S. 1034 (1969).[18]

Although past decisions have referred to the analyses of these factors as a "totality of the circumstances" test, *Austin* insightfully explains that existence of one or more of the factors validates a one-on-one identification precisely because it signifies that the police had "good reason" for what they did, and, therefore, the showup was not unnecessarily suggestive. It is for this reason that *Austin, supra* at 362, citing *Commonwealth* v. *Colon-Cruz*, 408 Mass. 553, 538-539 (1998), notes that "the existence of 'good reason' presents a question of law for the appellate court to resolve on the facts found by the motion judge." As we explained in *Commonwealth* v. *Colon-Cruz, supra*, it is the requirement of appellate courts to "review the judge's application of constitutional principles to the facts." The unmistakable implication is that the question whether "good reason" exists is *the* test to determine whether a showup was unnecessarily suggestive, and, consequently, unconstitutional. Cf. *State* v. *Dubose*, 285 Wis. 2d 143, 155-156 (2005) (showups inadmissible unless, based on "totality of the circumstances," they are "necessary").[19]

Perhaps most notably, *Austin* never examines — nor even

---

[18] I do not disagree that there may be other factors relevant to whether the police had "good reason" to hold a showup. However, this does not alter the principal proposition that the police need some "good reason" to engage in an inherently suggestive identification procedure.

[19] The Supreme Court of Wisconsin recently joined our court in rejecting the *Brathwaite* reliability standard in *State* v. *Dubose*, 285 Wis. 2d 143 (2005). In doing so, the court found that "[i]t is now clear to us that the use of unnecessarily suggestive evidence resulting from a showup procedure presents serious problems in Wisconsin criminal law cases." *Id.* at 164. The case involved a one-on-one showup of a suspect caught while fleeing the area of a reported armed robbery minutes after it occurred. The court focused on whether a more reliable identification procedure could have been used, and adopted a new standard for showups emphasizing such a requirement. *Id.* at 176-177. While I do not suggest that we presently adopt the Wisconsin standard, which, among other things, would fundamentally change our jurisprudence on showups conducted in the immediate aftermath of a crime, its analysis of the subject is

mentions the existence of — any factor other than "good reason" that would bear on the question whether a showup was unnecessarily suggestive. It certainly includes no hint that the "true" test of a showup's constitutionality is whether the police procedure which led to the showup was sensible. Instead, *Austin*'s entire inquiry focused on whether the police had good reason for the showup in that case, and concluded "that, in the circumstances, which included a serious risk to public safety posed by a series of crimes having a similar modus operandi [including the use of a gun] and eyewitnesses who appeared exceptionally nonsuggestible, the police had good reason for what they did, and the [procedure] was not, as a result, unnecessarily suggestive." *Austin, supra* at 364. Put more aptly, the procedure was held not to be unnecessarily suggestive "as a result" of the good reason police had to use it, not as a result of some multi-factorial test that might or might not take into account whether good reason for the particular showup existed.

In my view, *Austin* is clear, and quite correct, that in order to afford the "utmost protection against mistaken identifications," see *Johnson, supra* at 465, this court requires the police to have "good reason" to hold an identification confrontation that is disfavored because of its inherent suggestivity.[20] In this case, however, there does not appear to be any "good reason" that would justify the challenged showup. Although the court alludes to three possible "good reasons" for the showup, none is adequate.[21]

The court notes, in passing, that showups arranged "promptly

worthy of consideration.

[20]See, e.g., *Johnson, supra* at 471 (noting that the flaw in the Federal test is that it analyzes "the probable accuracy of a challenged identification, instead of the necessity for its use"). The police may very well, in certain cases, have a sufficiently good reason to hold a showup even if it is not absolutely necessary and even if less suggestive procedures are available. I would simply require the police to have a good reason for proceeding in this manner. See note 22, *infra*.

[21]As the Appeals Court noted, there is nothing at all to distinguish this case from the routine police investigation that follows any serious criminal incident. See *Commonwealth* v. *Martin*, 63 Mass. App. Ct. 587, 592 (2005) ("We are aware of no case in which a showup identification was admitted on facts that, like these, suggest no special need. Although it has created certain exceptions, the Supreme Judicial Court has not, as yet, indicated that one-on-one identification procedures have ceased to be 'disfavored' ").

after the criminal event" are an exception to the general presumption against showups, and "regularly held [to be] permissible." *Ante* at 280, quoting *Commonwealth* v. *Bowden*, 379 Mass. 472, 479 (1980). See, e.g., *Commonwealth* v. *Barnett*, 371 Mass. 87, 92 (1976).[22] That exception, however, is confined to showups held in the *immediate* aftermath of a crime and thus has no applicability to this case (where the showup took place on the fifth day after the incident). The remaining "good reasons" suggested by the court run afoul of our warning in *Austin* that the analysis of good reason "cannot be generalized," but "must be resolved on [each case's] peculiar facts." *Austin, supra* at 362. To accept any of the court's justifications for the showup would stretch the concept of good reason so far as to make it a toothless standard.

[22]The immediate aftermath exception applies "when the police, promptly after a criminal episode, show a defendant singly to a person for the sole purpose of identifying the wrongdoer." *Commonwealth* v. *Leaster*, 395 Mass. 96, 102 (1985). In these cases, the police often begin searching for and find a suspect within minutes or hours after the reported crimes. See, e.g, *Commonwealth* v. *Thompson*, 427 Mass. 735 (1988), cert. denied, *Thompson* v. *Massachusetts*, 525 U.S. 1008 (1995) (showup held within approximately one hour of crime); *Commonwealth* v. *Moffett*, 383 Mass. 201, 213 (1981) (showup held "within half an hour of the assault and battery"); *Commonwealth* v. *Bowden*, 379 Mass. 472, 479 (1980) (showup held approximately "two hours after the murder"); *Commonwealth* v. *Barnett*, 371 Mass. 87, 88-89 (1976), cert. denied, 429 U.S. 1049 (1977) (showup of wounded suspect — taken to hospital shortly after wounded victim taken to hospital — within hour of shooting). See also *Commonwealth* v. *Connolly*, 356 Mass. 617, 623-624, cert. denied, 400 U.S. 843 (1970); *Commonwealth* v. *Bumpus*, 354 Mass. 494, 497-502 (1968), cert. denied, 393 U.S. 1034 (1969); *Commonwealth* v. *Storey*, 378 Mass. 312, 316-318 (1979), cert. denied, 446 U.S. 955 (1980); *Commonwealth* v. *Venios*, 378 Mass. 24, 29 (1979). In such circumstances, "the police procedure of arranging [a showup] is recognized as usual and natural and justified by the need for efficient investigation in the immediate aftermath of crime." *Commonwealth* v. *Barnett, supra* at 92. "[P]rompt confrontation yielding a negative result, besides freeing the innocent, informs the police that a possible predisposition on their part is or may be in error and releases them quickly to follow another track." *Id.* Additionally, allowing for an identification immediately after a crime "provides the witness with good opportunity for an accurate identification" because the witness can "view the suspect while his recollection or mental image of the offender is still fresh" and "before other images . . . or his attempts to verbalize his impressions . . . distort the original picture." *Id.* That the showup in the instant case was not conducted in the "immediate aftermath" of the crime is readily apparent. The police did not begin driving the victim around until the day following the attack, and the one-on-one identification occurred five days later.

The court suggests that the showup was permissible because the police did not need to consider less suggestive alternatives where they were dealing with a man walking in a beach area on a summer day, where the "police clearly did not have enough evidence to compel the defendant to accompany them to the police station," *ante* at 280, and where there was "no evidence . . . that the defendant would have agreed to an alternate procedure or that he would not have fled during the time necessary to arrange one." *Ante* at 280. The court's position, in essence, is that police may permissibly hold a showup when they are investigating a suspect whom they do not have probable cause to arrest. Such a rule would lead to an odd result: the less evidence there is to suspect a person of a crime, the greater the ability of the police to subject that person to an inherently suggestive identification procedure, which we have acknowledged often leads to misidentification. If the lack of probable cause alone creates a sufficiently good reason to hold a showup, we can expect a significant increase in the use of this generally disfavored procedure, as good reason would exist (and showups would be permissible) in an unimaginable number of investigations.

In any event, the police were not without available identification alternatives simply because no probable cause existed. They could have attempted to obtain the defendant's cooperation to appear in a lineup, could have attempted to get his permission to take his photograph, could have photographed him without permission, or could have placed him under surveillance. The court tries to explain away the police conduct by noting that there was no evidence "that the defendant would have agreed to an alternate procedure." *Ante* at 280. However, there was no evidence precisely because the police do not seem to have even considered whether they could have obtained this identification through less suggestive means.[23] Had the suspect refused to agree to an alternate procedure, the police may have

[23]The court would essentially relieve the police of any obligation to consider a less suggestive identification procedure in every case where they lack probable cause to arrest and, thus, where any contact between police and a suspect might increase the risk of flight. This would remove almost all barriers to the widespread incorporation of the showup in routine police procedure.

had good reason to hold the showup. But that did not occur in this case.

The court misses the point when it argues that "[f]ailure of the police to pursue alternate identification procedures does not in itself render an identification unduly suggestive." *Ante* at 280. Showups constitute a suggestive identification procedure. The issue is whether the showup was unnecessary. This question is quite appropriately linked to whether the police had, attempted to pursue, or even considered pursuing, readily available alternatives.[24] Indeed, it seems quite unnecessary to hold a showup in these circumstances before finding out if the suspect will agree to a less flawed form of identification or whether a suspect can be properly subjected to a more covert involuntary form of identification (i.e., photographing without his consent).[25] Cf. *Austin, supra* at 363 (validating identification procedure akin to showup in part because "defendant does not suggest an alternate identification procedure was available and should have been employed" and because court concluded no other option existed).

The court finally suggests that good reason for the showup existed because the process of "having the victim, whom the police viewed as 'a very good witness [who] . . . felt she could make an identification,' drive with them to view all men in a geographically reasonable area was a sensible approach to a dif-

---

[24]The court characterizes the "good reason" requirement as creating a best evidence rule. Such a caricature is, quite obviously, inaccurate. I do not suggest that if a less suggestive means of identification exists, it must always be used. However, whether such means exist and whether the police have explored the possibility of using them is certainly relevant to whether there was a good reason to hold a showup.

[25]The court would place the burden of proof on the defendant to establish that he was willing to accompany police for a lineup or have his photograph taken. This, of course is beside the point. The question is not whether the defendant would have acquiesced to an alternate procedure, but whether the police had good reason to use an inherently suggestive one. In this case, whether the police explored or considered a nonsuggestive alternative is particularly relevant to the existence of good reason. Regardless, the only evidence we have on the subject shows that the defendant was compliant with the police. Although the court notes that the defendant asked to leave the beach area, it does not mention the fact that the defendant obediently followed the police request that he not leave. There was no evidence that he would not have agreed to additional police requests.

ficult investigative problem." *Ante* at 284. The court explains that "the police could not bring into the station or photograph each man in the entire area who met the victim's description of her assailant" and that "[t]he police did the equivalent in a more efficient manner by canvassing the area in the company of the victim." *Ante* at 284. This explanation is irrelevant. The challenged procedure here is not the general investigatory policy of drive-by viewings. Rather, the challenge is to one specific showup. The "good reason" required of the police must be correspondingly specific. See *Austin*, *supra* at 362 ("the analysis cannot be generalized"). The question is not whether the police could have taken photographs of all men matching the suspect's description, but, for example, whether it could have readily done so in the circumstances of a single individual identified by the victim's father.

The court is, of course, correct that the police procedure used here is more efficient than many other identification procedures. But this would be true in a large number of investigations. It cannot be seriously contended that something inherently and generally true of almost all showups can provide the constitutionally required good reason to justify the use of such a disfavored identification procedure in the present case.

The facts of this case are a far cry from what we have found to be good reason for a showup not conducted in the immediate aftermath of a crime. For example, in *Austin*, *supra* at 362-363, "[t]hree armed bank robberies (in New Hampshire, Massachusetts, and Rhode Island) had occurred within a few days of each other"; they "bore a high degree of similarity"; and the robber had fired his weapon at police and bystanders. *Id.* at 362, 363 & n.4. The robber's appearance on the surveillance video tape of the third (Rhode Island) bank bore a resemblance to the composite drawing created from the description given by bank employee witnesses to the second (Massachusetts) bank robbery. *Id.* at 362. The witnesses, each of whom told police that they had a very good look at the robber in the bank, and were certain they could identify him if they saw him again, were asked to view the surveillance video tape and each identified the robber of the third bank as the robber of the second bank. *Id.* at 359-360, 362. We equated the identification

procedure with a showup, see *id.* at 361, but explained that "a prompt viewing by the witnesses of the surveillance tape . . . was needed. Specifically, the police needed to determine . . . whether the robberies were committed by a single individual" in order to "focus their investigation accordingly." *Id.* at 363. We noted that "[f]acing robberies in three States, the police departments involved could not make effective determinations on how to proceed in attempting to locate what might have been several perpetrators." *Id.* We concluded that "in the circumstances, which included a serious risk to public safety posed by a series of crimes having a similar modus operandi and eyewitnesses who appeared exceptionally nonsuggestible, the police had good reason for what they did, and the . . . videotape identification was not, as a result, unnecessarily suggestive." *Id.* at 364. Nothing in the case today resembles the facts that underlay the finding of good reason in *Austin*[26] or any other case in this area of law.

3. *Reliability.* Equally troubling about the court's opinion is its backtracking on the principles we adopted in *Johnson.* The court first finds that the drive-by viewings engaged in by the victim are relevant because the victim rejected all of the subjects before she made a positive identification of the defendant. It then credits the judge's assessment of the victim's credibility, and considers these adequate grounds on which the judge could "permissibly determine that the procedure was not unduly suggestive." *Ante* at 281. But the proper question for the court is whether there was a good reason to use an inherently suggestive procedure in the circumstances, not whether the witness was reliable or credible in making her identification. See *Johnson*, *supra* at 471, quoting *Brathwaite*, *supra* at 128 (Marshall J., dissenting) ("The reliability approach has the . . . effect of expanding a reviewing court's powers because it allows the court to examine subjectively the circumstances surrounding the original crime on a case-by-case basis instead of objectively examining the identification procedures employed by the police. . . . 'By relying on the probable accuracy of the chal-

---

[26]There was no evidence at the suppression hearing of a series of attempted assaults, rapes, or kidnappings — other than the one reported by the victim — that suggested the attacker would continue his assaults until he was caught.

lenged identification, instead of the *necessity* for its use, the Court seems to be ascertaining whether the defendant was probably guilty' " [emphasis added]). Reliability is the *Brathwaite* standard that we rejected in *Johnson*. Such findings are only relevant to the admissibility of subsequent identifications, and whether the victim had an adequate basis independent of the suggestive identification to make such an identification; they are not relevant to the necessity of the procedure in the first place. See *Commonwealth* v. *Botelho*, 369 Mass. 860, 867 (1976), quoting *Stovall* v. *Denno*, 388 U.S. 293, 302 (1967), overruled in part on other grounds, *Griffith* v. *Kentucky*, 479 U.S. 314 (1987) ("In deciding whether a particular confrontation was unnecessarily suggestive, the judge is to consider 'the totality of the circumstances surrounding it.' . . . This has been understood to refer to the episode itself; it does not extend to a consideration of the witness's entire connection with the case to determine whether the confrontation, although set up in such a way as to be unnecessarily suggestive, was nevertheless reliable, and therefore usable — for example, because the witness had a clear perception of the offender and would not be misled by a one-on-one confrontation or the like."). *Id.* at 867 n.5 ("Such evidence . . . rather enters necessarily into the second stage if that is reached [concerning the potential taint to a subsequent in-court identification] — consideration of the question whether the witness's ability to identify had an independent source").

Because there was no "good reason" for the showup in this case, particularly in light of the suggestive manner in which the showup was conducted, I agree with the Appeals Court that the identification made at that showup should have been barred at the trial as evidence from an "unnecessarily suggestive" identification procedure. *Commonwealth* v. *Martin*, 63 Mass. App. Ct. 587, 593, 594 (2005).

4. *Harmless error analysis.* We review admissions of evidence of unconstitutional identifications for harmless error. See *Commonwealth* v. *Jones*, 423 Mass. 99, 106 (1996). Erroneous admissions of such evidence will not amount to reversible error only "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reason-

able doubt." *Commonwealth* v. *Howard*, 446 Mass. 563, 570 (2006), quoting *Commonwealth* v. *Miles*, 420 Mass. 67, 73 (1995), quoting *Delaware* v. *Van Arsdall*, 475 U.S. 673, 681 (1996).

In this case, the victim made three identifications of the defendant. The first was the showup, the second was a photographic array arranged seven hours after the showup, and the third was an in-court identification. Assuming there was clear and convincing evidence of an adequate independent source for the in-court identification, which, from the record, appears plausible, I cannot say confidently that the admission of evidence of the victim's identification of the defendant at the showup was harmless beyond a reasonable doubt.

Identification was the key issue at trial. Shortly after the jury began deliberating, they returned with a question regarding the mark the victim recognized on the defendant's face at the showup, specifically, whether the victim had "testif[ed] to the mark . . . in her initial description which she gave to the person who drew the composite." She had not. The first time she had mentioned this mark to anyone was at the showup. The judge, however, informed the jury that they had to "determine [the answer] from [their] collective memory of the facts."

The jurors' question demonstrates that they were struggling over whether the victim's initial identification of her assailant was reliable, and whether the victim's primary basis for the showup identification and future identifications — the mark — was credible. The jurors then sent a second note to the judge that reinforces this conclusion: "With regard to the identity of the assailant, we cannot come to agreement that he in fact is the right person and therefore cannot move forward to deliberate on the indictments." Two days later, after the judge gave a *Rodriquez* charge (see *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 101 [1973] [Appendix A]) in response to the foreperson's reporting that they were deadlocked, the jury returned guilty verdicts.

The ultimate determination of the credibility of a particular identification or set of identifications rests, as with all other credibility determinations, with the jury. Similarly, the weight to be given to the various types of identifications in this case is also uniquely the province of the jury. See *Commonwealth* v.

*Melvin*, 399 Mass. 201, 207-208 (1987), and cases cited ("degree of suggestiveness present in the identification" if not constitutionally impermissible "went to the weight, not the admissibility, of this evidence," which is "for the jury to assess"). In the circumstances of this trial, however, I cannot say that the judgment of the jury was not swayed by the erroneous admission in evidence of the unnecessarily suggestive showup identification. I would reverse the convictions and order that a new trial be held.