## COMMONWEALTH *vs.* JASON AMARAL.

No. 10-P-1514.

Bristol. October 14, 2011. - January 18, 2012.

Present: MILLS, KATZMANN, & MILKEY, JJ.

*Identification. Evidence,* Identification, Disclosure of evidence, Exculpatory, Photograph. *Due Process of Law,* Identification. *Practice, Criminal,* Motion to suppress, Disclosure of evidence, Conduct of prosecutor. *Armed Assault with Intent to Rob.*

A Superior Court judge properly denied a criminal defendant's pretrial motion to suppress evidence of a showup identification that took place when the defendant, whose appearance matched that of an attempted robbery suspect, was found in the immediate aftermath and locale of the attempted robbery, where there was nothing about the showup evidence that was so inherently unfair that the jury had to be prevented from being exposed to it. [148-149]
The Commonwealth's late disclosure of a photographic array (which it had assembled but not used) to a criminal defendant the day before trial did not cause the defendant any prejudice, where the defendant fully exploited any exculpatory value that the unused photographic array offered. [150-152]

INDICTMENT found and returned in the Superior Court Department on April 10, 2009.

A motion to dismiss the indictment was heard by *Frances A. McIntyre,* J.; a pretrial motion to suppress evidence was heard by *D. Lloyd Macdonald,* J.; and the case was tried before *Barbara A. Dortch-Okara,* J.

*Amy M. Belger* for the defendant.

*Kristen L. Spooner,* Assistant District Attorney, for the Commonwealth.

MILKEY, J. For the attempted robbery of a pharmacy, a Superior Court jury convicted the defendant of armed assault with intent to rob, G. L. c. 265, § 18(*b*). The issue at trial was identification. On appeal, the defendant raises a variety of arguments regarding both the showup procedure that police used, and a photographic array that police assembled but did not use. We affirm.

1. *Background.*[1] a. *The crime.* On the evening of March 16, 2009, a man stood in line at a Walgreens store in Fall River. He was wearing a dark-colored coat that had a light-colored hood and sleeves. When the man got to the front of the line, he removed from his inner coat pocket a knife that was in a black sheath, and he demanded that the cashier give him all her money. The cashier, Eileen Dumont, refused and walked away. The man yelled that he wanted cigarettes and then left the store.

b. *The apprehension of a suspect.* The Fall River police, including Officer Niles, responded quickly. Officer Niles interviewed Dumont and Kathleen Syde, a customer who had been standing behind the man in line. According to Niles, Dumont and Syde described the man in "almost identical" terms: a white male with some facial hair who was wearing a black and white coat, jeans, and a baseball hat. Niles then watched a store surveillance video that showed the attempted robbery suspect wearing the two-tone jacket. The video apparently does not depict his face in sufficient detail to reveal identifying characteristics.[2]

Niles then left the store to attempt to locate the suspect in the vicinity. Almost immediately, she spotted the defendant at a gasoline station convenience store across the street. Her attention was drawn to him because the coat he was wearing appeared to match the one she had seen in the surveillance video. The defendant was wearing blue jeans and a baseball cap, and he had a thin goatee. A patfrisk revealed that he had a knife in a black sheath in his inner coat pocket.

c. *The showup.* Officer Niles and her colleague, Officer Copsetta, brought the defendant back to the Walgreens to conduct an identification procedure commonly known as a "showup."

[1]The testimony at trial and the testimony at the motion to suppress challenging the showup evidence were consistent overall, and we highlight any differences only to the extent they are material. The defendant has not challenged any of the motion judge's subsidiary factual findings.

[2]The video was shown to the jury at trial and introduced in evidence. Because it was not transmitted to this court, we do not know precisely what the jury saw. However, according to testimony at the motion to suppress hearing, "no facial features [are] identifiable" in the video. In any event, the Commonwealth made no argument below, or on appeal, that one viewing the video would be able to observe any identifiable facial features, and, for purposes of this appeal, we assume this to be the case.

Niles stood with the defendant in a well-lit area outside the store, and Copsetta brought Dumont to the front of the store to observe the defendant through glass doors. The extent to which Dumont was able to identify the defendant at the showup, and the basis on which she did so, became key issues in the case. As detailed below, somewhat different accounts of exactly what transpired during the showup emerged over the course of the case.

d. *The grand jury.* Before the grand jury, Officer Niles testified that Dumont identified the defendant as the man who attempted to rob her. Few details were given. The grand jury indicted the defendant on April 10, 2009.

e. *The* O'Dell *motion.* Meanwhile, the defendant hired Richard Ferreira, a private investigator, to interview Dumont. According to Ferreira, Dumont told him that she never identified the defendant as the man who tried to rob her because "she never looked at his face." Claiming that this demonstrated that he had been indicted based on false grand jury testimony, the defendant on August 27, 2009, filed a motion to dismiss the indictment pursuant to *Commonwealth* v. *O'Dell*, 392 Mass. 445 (1984). A Superior Court judge denied that motion after a nonevidentiary hearing.

f. *The motion to suppress.* The defendant subsequently moved to suppress the evidence regarding the showup identification on the grounds that "it was the product of a constitutionally impermissible one-on-one confrontation, unduly suggestive and inherently unfair." Officers Niles and Copsetta testified at the suppression hearing. Niles testified that she saw Dumont nod her head affirmatively during the showup procedure, but that she could not hear what Dumont and Copsetta said to each other given that she (Niles) was outside at the time. Copsetta testified that after some initial reluctance (which he attributed to fear), Dumont affirmatively identified the defendant as the man who tried to rob her.

Neither side called Dumont to testify at the suppression hearing, but the defendant called Ferreira, who purported to relay Dumont's account (without objection on hearsay grounds). According to Ferreira, Dumont told Copsetta before the showup that she would not be able to identify anyone from his facial

features because she did not look at his face. Then, after she was shown the defendant, she again told Copsetta that she could not identify him. Copsetta testified that he could not recall Dumont making such statements.

After finding the testimony by both police officers credible, the motion judge denied the motion to suppress. He concluded that there was good reason to conduct a showup given the proximity in space and time between the crime and the apprehension of a person that fit the eyewitness description (and what Officer Niles herself had observed on the videotape). The motion judge also concluded that the showup "was conducted without unnecessary suggestiveness." With regard to the apparent discrepancies between the two versions of the showup, the motion judge stated that "the victim's alleged later retraction as to whether she saw the defendant's face does not affect the issue of the appropriateness of the show-up."

g. *The photographic array.* The prosecutor requested that police put together a photographic array to bring to the hearing on the *O'Dell* motion. Officer Niles assembled the array, and she included in the case file a memorandum noting that she had produced it at the prosecutor's request. However, the police never showed the array to Dumont (or Syde), and the prosecutor did not reveal its existence during pretrial discovery. Defense counsel first learned of the array the day before the scheduled trial when she stopped by the police station to examine the case file. Asserting that the failure to disclose the array earlier was a serious discovery violation, the defendant variously argued for a continuance, a mistrial, exclusion of the showup evidence, and recusal of the prosecutor (so that he could be called as a witness). The trial judge denied all such motions.

h. *The trial.* Dumont was unable to identify the defendant in the court room.[3] Nor was she able to identify him from the photographic array, which was shown to her at trial.[4] Thus, the showup provided the only evidence of Dumont's identification of the defendant as the attempted robber.

---

[3]Syde also could not identify the defendant at trial, despite repeated efforts by the prosecutor to get her to do so. She was never asked to identify him prior to trial.

[4]Dumont also could not identify the defendant from the array when Ferreira showed it to her the day before trial started.

In the course of the pretrial and trial proceedings, it became evident that both the prosecutor and defense counsel expected there to be significant discrepancies between what Dumont and Copsetta would say about the showup. Each side offered different explanations for the anticipated discrepancies. In his opening statement to the jury, the prosecutor highlighted that there would be "a conflict" between what Dumont had told police during the showup and what she would testify to now, and that the jury would "need to decide which version is correct." Thus, the Commonwealth suggested that Dumont had initially positively identified the defendant but had later recanted. The defendant maintained that Dumont had always told the truth about her inability to identify the defendant (and that police claims that she did identify him at the showup were untrue). In this manner, the defendant based his defense on the jury's believing what Dumont would say in her upcoming testimony. In fact, counsel went so far in her opening as to state that Dumont is "going to tell you that [the defendant] is not the individual that committed that crime on that day at that place."

When Dumont actually took the stand for the first time at trial, her account of what happened during the showup was far closer to that of the testifying officers than either side had anticipated it would be. Although she testified, as expected, that she had always maintained that she could not identify the defendant by his facial features, she declined to endorse the defendant's position that she had failed to identify him. Rather, she indicated that she in fact did identify him at the showup, albeit based on his clothing, not his facial features. In her words, "I couldn't identify his face; just his clothing."[5]

To be sure, Dumont's account of the showup and that of the police were not identical. For example, Dumont testified that she affirmatively told Copsetta before the showup that she would not be able to identify anyone based on facial features and that she repeated the same to him after the defendant was shown to

---

[5]We do not mean to suggest that Ferreira misstated what Dumont told him. In fact, it is relatively easy to harmonize Dumont's detailed trial testimony with the account that Ferreira gave at the suppression hearing. Dumont even acknowledged at one point that she told Ferreira that she could not "identify" the perpetrator, though she immediately qualified that by saying that she "could identify clothing maybe, but not his face."

her, while Copsetta again stated that he could not recall Dumont making such statements. In his closing argument, the prosecutor recognized that, despite there being some disharmonies, the two versions of what occurred at the showup were not actually that far apart. Specifically, while continuing to maintain that Dumont never in fact told the police the limited basis of her identification, the prosecutor suggested that perhaps the police would have learned of this had they probed her further at the time. The jury found the defendant guilty.

2. *Discussion.* a. *Motion to suppress.* One-on-one identification procedures "are generally disfavored because they are viewed as inherently suggestive." *Commonwealth* v. *Martin*, 447 Mass. 274, 279 (2006). However, exclusion of showup identification evidence is required only where the defendant, carrying the burden of proof, can demonstrate "that the showup was 'so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny [him] due process of law.' " *Id.* at 280, quoting from *Commonwealth* v. *Odware*, 429 Mass. 231, 235 (1999). If the identification passes muster under this test, then it is for the jury to decide what weight to give to the identification. See *id.* at 236.

In reviewing whether a showup was "unnecessarily suggestive," the key question is whether police had "good reason" to follow such a procedure. *Commonwealth* v. *Austin*, 421 Mass. 357, 361 (1995). We agree with the motion judge that the police had "good reason" to conduct a showup here, where, in the immediate aftermath and locale of an attempted armed robbery, the police apprehended a suspect that met eyewitness descriptions. Indeed, it is in exactly this sort of context that showups "have been regularly held permissible" by Massachusetts courts. *Commonwealth* v. *Olavarria*, 71 Mass. App. Ct. 612, 623 (2008), quoting from *Commonwealth* v. *Martin, supra* at 280. Employing a showup here allowed Dumont "to view the suspect while recollection is fresh and before other images crowd in to distort the original picture." *Commonwealth* v. *Walker*, 421 Mass. 90, 95 (1995), quoting from *Commonwealth* v. *Coy*, 10 Mass. App. Ct. 367, 371 (1980). Further, had Dumont told police that the defendant was not the right man, this would have allowed them

to release him and to refocus their efforts elsewhere. See *Commonwealth* v. *Powell*, 72 Mass. App. Ct. 22, 26 (2008).[6]

The fact that the defendant was wearing a two-tone jacket during the showup does not change the analysis. See *id.* at 26 ("That the defendant possessed at the time of the identification a hat and jacket that the witness had identified as being worn by the person in the dealership window was not an overly suggestive circumstance created by the police"). Here, as in *Powell*, "[t]rial counsel had the opportunity to bring out the weaknesses of the witness's identification." *Ibid.* Dumont testified that she identified the defendant by his clothes, not his facial features, and the police witnesses did not actually maintain otherwise. In fact, the prosecutor all but conceded the point in his closing argument. Under these circumstances, it is impossible to imagine the jury having missed the qualified nature of Dumont's identification. But this did not mean that the identification lacked probative value. *Commonwealth* v. *Olavarria, supra* at 623 ("That the witnesses who saw the would-be robber did not recognize his face does not preclude their identifying other features such as his build, the color of his hair, or his complexion"). In the end, it was for the jury to decide how much value to place on this evidence. See *Commonwealth* v. *Odware*, 429 Mass. at 236. See also *Commonwealth* v. *Campbell*, 60 Mass. App. Ct. 215, 220 (2003) ("Expressions of uncertainty regarding eyewitness identification, like expressions of certainty, go to the weight of the evidence and are for the jury"). In sum, there was nothing about the showup evidence that was so inherently unfair that the jury had to be prevented from being exposed to it.[7]

---

[6]The defendant protests that other identification methods were available, even in the field. But the test is not whether alternatives were reasonably available. See *Commonwealth* v. *Martin*, 447 Mass. at 283 ("The question is whether the procedure used was permissible, not whether an alternative would have been better").

[7]Ferreira testified at the suppression hearing that police had informed Dumont before the showup that they had found a knife on the defendant. Copsetta testified that he could not recall "if" he had done so, and the motion judge made no findings on this issue. We conclude that this factual dispute is inconsequential. Even if the police's telling Dumont about the knife would have made the showup somewhat more suggestive (and therefore would have been better left unsaid), we do not think it would have mandated exclusion of the identification evidence.

b. *Disclosure of the photographic array.* The defendant maintains that the evidence about the unused photographic array had exculpatory value, and that the Commonwealth's failure to turn over that information in the ordinary course of discovery violated both the prosecutor's obligations pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), and a specific discovery order that was in place.

"To prevail on a claim that the prosecution failed to disclose exculpatory evidence, the defendant must first prove that the evidence was, in fact, exculpatory." *Commonwealth* v. *Healy*, 438 Mass. 672, 679 (2003). The defendant asserts two kinds of exculpatory value. First, the defendant claims that the Commonwealth's shelving of the array demonstrates that the prosecution must have doubted the eyewitnesses' ability to pick him out in the array. But any personal beliefs held by the prosecutor regarding the evidence are irrelevant, and, hence, inadmissible.[8] See, e.g., *Commonwealth* v. *Pimental*, 454 Mass. 475, 483 (2009). See also Mass.R.Prof.C. 3.8(i), as appearing in 428 Mass. 1305 (1999). Thus, to the extent that the Commonwealth's failure to use the array suggested doubt about whether Dumont could identify the defendant from his facial features, the defendant has not shown what exculpatory value this would have provided.[9]

The defendant also argues that the Commonwealth's failure to use the already assembled array supports his defense that the police did not take adequate steps to investigate the crime. See generally *Commonwealth* v. *Bowden*, 379 Mass. 472, 485-486 (1980) (recognizing that "[t]he failure of the authorities to conduct certain tests or produce certain evidence" can be "a permissible ground on which to build a defense").[10] However,

[8]This is not a case where the defendant can show that the prosecutor suborned perjury, or otherwise pressed factual allegations that he knew not to be true. Compare *Miller* v. *Pate*, 386 U.S. 1, 6-7 (1967).

[9]Granted, whether there were underlying reasons for police to doubt that Dumont would pick out the defendant from a photographic array *was* material, but that was hardly news to either side. Indeed, through the interviews of Dumont that Ferreira conducted even before the array had been assembled, the defendant had become well aware that Dumont was disclaiming any ability to recognize the perpetrator based on his facial features. By the time of the trial, Ferreira had interviewed Dumont on at least three occasions, and even had had the opportunity to show her the array.

[10]The defendant separately argues that the trial judge erred by declining to give the jury a *Bowden* defense instruction. However, the defendant had the

any incremental value that this evidence added to the defendant's *Bowden* defense was slight, at best. That is because the defendant was independently aware that the police had not shown the eyewitnesses a photographic array, and he had other available means to prove that the police readily could have generated one (as his counsel ably demonstrated through cross-examination).[11]

Even if the array evidence had some minimal exculpatory value, its late disclosure did not cause the defendant any prejudice. Whether the defendant's obtaining the material is seen as late pretrial discovery, or as mere happenstance, the defendant had it before trial began. "In measuring prejudice, it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask whether the prosecution's disclosure was sufficiently timely to allow the defendant to make effective use of the evidence in preparing and presenting his case." *Commonwealth* v. *Stote*, 433 Mass. 19, 23 (2000) (quotation omitted). The defendant was able to get before the jury that the police failed to use the array and

opportunity to argue his *Bowden* defense to the jury, and here, as in *Commonwealth* v. *Rivera*, 424 Mass. 266, 274 (1997), cert. denied, 525 U.S. 934 (1998), "[t]he judge's refusal to comment specifically on the failure of the police to conduct [certain procedures] did not undermine the defense and was not an abuse of discretion." See *Commonwealth* v. *Williams*, 439 Mass. 678, 687 (2003) ("[i]n this case, the judge did not remove the inadequacy of the police investigation from consideration by the jury and so complied fully with *Bowden*'s only requirement").

[11]The unused array's potential materiality was so opaque that the defendant's trial counsel at one point expressly disclaimed there being any *Brady* violation. Because of the lack of any apparent materiality, the defendant's boilerplate discovery request for "any and all witness statements and reports" did not put the prosecutor on notice that the array materials (including the memo that Niles prepared for the file) were the kind of documents being targeted. Compare *Commonwealth* v. *Gallarelli*, 399 Mass. 17, 20-22 (1987), with *Commonwealth* v. *Brown*, 57 Mass. App. Ct. 852, 855-857 (2003). With regard to the Commonwealth's obligation to turn over discovery material of marginal materiality, we reiterate the Supreme Judicial Court's recent observation that "[p]rosecuting attorneys [should] become accustomed to disclosing all material which is even possibly exculpatory, as a prophylactic against reversible error and in order to save court time arguing about it." *Commonwealth* v. *Murray*, 461 Mass. 10, 23 n.10 (2011) (alteration in original), quoting from Reporters' Notes (revised, 2004) to Mass.R.Crim.P. 14, Mass. Ann. Laws, Rules of Criminal Procedure, at 1490 (LexisNexis 2011-2012). See *Commonwealth* v. *St. Germain*, 381 Mass. 256, 262 n.10 (1980).

that Dumont would have been in any event unable to identify him from it. In addition, unimpeded by any objection from the Commonwealth, the defendant took the opportunity, in both witnesses' examination and closing argument, to assert that the Commonwealth's decision not to use the array demonstrated its doubts about the eyewitnesses' ability to identify him.[12] Any exculpatory value that the unused array offered was fully exploited.[13] Cf. *Commonwealth* v. *Ellison*, 376 Mass. 1, 25 (1978), citing *Brown* v. *United States*, 556 F.2d 224, 227-228 (3d Cir. 1977) (indicating that a *Brady* error does not require reversal where "the defendant has somehow become aware at the trial of the contents of the undisclosed material and had full opportunity to examine on it").[14]

*Judgment affirmed.*

---

[12]The Commonwealth did contest the defendant's request to call the prosecutor as a witness, and the judge did not err in refusing that request given the irrelevance of any testimony the prosecutor had to offer.

[13]The defendant also challenges the trial judge's denial of his request for a continuance. In weighing that request, the trial judge specifically examined the defendant's opportunity to make use of the evidence at trial. She did not abuse her discretion in denying the defendant more time. See *Commonwealth* v. *Felder*, 455 Mass. 359, 367 (2009) (recognizing a trial judge's discretion on such issues). Although additional time might have allowed the defendant's trial counsel to hone her cross-examination regarding prosecutorial doubt, so too it might have allowed the prosecutor to press a claim that this line of questioning was improper.

[14]In addition to raising the identification issues, the defendant claims that the trial judge committed reversible error in not providing him adequate time to consult with his counsel as to his peremptory challenges. Although the transcript is not clear on precisely how much consultation time was provided him, it reveals that he had significantly longer than the "[one] minute" he claims. Moreover, the defendant declared himself "content" with the jury. Even putting aside his waiver of the issue, the defendant cannot demonstrate that the trial judge abused her discretion or otherwise deprived him of his right to be tried before an impartial jury.