NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-331                                            Appeals Court

COMMONWEALTH  vs.  JAVIER RIVERA.

No. 16-P-331.

Bristol.     April 5, 2017. - July 17, 2017.

Present:  Milkey, Sullivan, & Desmond, JJ.

Possession of Burglarious Instruments.  Constitutional Law,
    Identification.  Due Process of Law, Identification.
    Identification.  Practice, Criminal, Required finding,
    Motion to suppress, Argument by prosecutor.

Complaint received and sworn to in the Fall River Division
of the District Court Department on March 27, 2014.

A pretrial motion to suppress evidence was heard by Kevin
J. Finnerty, J., and the case was tried before him.

Meghan K. Oreste for the defendant.
Robert P. Kidd, Assistant District Attorney, for the
Commonwealth.

SULLIVAN, J.  The defendant, Javier Rivera, appeals from

his conviction of possession of a burglarious instrument, in

violation of G. L. c. 266, § 49.[1]  The defendant contends that

(1) the evidence was insufficient to show that he possessed a

burglarious instrument with intent to commit a crime, (2) the

showup procedure was unnecessarily suggestive, and (3) the

prosecutor argued facts not in evidence in his closing argument.

We affirm.

1.  Sufficiency.  Viewing the evidence in the light most

favorable to the Commonwealth, see Commonwealth v. Latimore, 378

Mass. 671, 676-677 (1979), a reasonable jury could find that on

the night of March 27, 2014, at around 1:45 A.M., a witness saw

two men across the street from his home.  The street was

otherwise deserted.[2]  The men were standing in front of a

convenience store, wearing dark clothing.[3]  While one of the men

was banging on the door with a bar or a crowbar, the other was

standing facing the street and looking in both directions.

Periodically, both men walked away to check the street.

Eventually, they left and the witness called the police.  When

an officer arrived, he noticed that the door to the convenience

---

[1] The defendant was acquitted of breaking and entering in the nighttime with the intent to commit a felony.  See G. L. c. 266, § 16.

[2] A nearby hot dog stand remained open until the early morning hours, but no witness testified to foot traffic on the night in question.

[3] There was no other description of the men's faces, skin tone, age, race, or identifying characteristics.

store had been pried open at the bottom, and there was a softball-sized hole in the door.  Another officer, who also arrived at the scene, drove around the immediate area with the car windows open searching for two men who fit the witness's description.  After driving for approximately ten minutes he saw two men in dark clothing about one-half mile from the store. The officer also heard "somebody drop some kind of metallic object, like a hard object fell on the ground" near the two men.[4]

The officer called for backup, drove past the men, parked his car, and walked back towards them.  He engaged them in conversation.  They were cooperative, and told the officer that they were walking to St. Anne's hospital, which was nearby. Other officers arrived and began to search the area; the defendant seemed nervous while speaking to these officers.  A screwdriver was found in a public area some twenty to thirty feet back from where the defendant and his companion stood talking to the officer, in the location where the officer said he heard a metal object fall.  A subsequent search of the defendant revealed a six-inch flashlight.

The two men were then driven to the convenience store. During a showup procedure, which occurred some fifteen to twenty minutes after the witness first saw two men, the witness told

---

[4] Cars were parked along the street, and his view of the men was partially obstructed by the cars.

police that the defendants' clothing was "definitely" the clothing the witness saw the men wearing, and that they were wearing the "exact same clothing."  However, the witness also said that he could not say exactly what they were wearing, and that he did not see their faces.  The police officers submitted photographs from which the jury were asked to infer that the screwdriver matched some of the pry marks left on the door.

"We review the denial of a motion for a required finding of not guilty to determine whether the evidence, viewed in the light most favorable to the Commonwealth, 'was sufficient to persuade a rational jury beyond a reasonable doubt of the existence of every element of the crime[s] charged.'" Commonwealth v. Gomes, 475 Mass. 775, 781 (2016), quoting from Commonwealth v. Lao, 443 Mass. 770, 779 (2005).

The Commonwealth's theory at trial was that the defendant and his codefendant participated in a joint venture to break into the convenience store using a bar or crowbar or the screwdriver, or both.  "A joint venture is established by proof that two or more individuals 'knowingly participated in the commission of the crime charged . . . with the intent required for that offense.'"  Commonwealth v. Winquist, 474 Mass. 517, 521 (2016), quoting from Commonwealth v. Bright, 463 Mass. 421,

435 (2012).[5]  We review the evidence in the light most favorable to the Commonwealth, mindful that a joint venture "may be proved by circumstantial evidence."  Commonwealth v. Braley, 449 Mass. 316, 320 (2007).

There is no question that the Commonwealth proved that two men tried to break into the convenience store using a tool in the early morning hours.[6]  Contrast Commonwealth v. Squires, 476 Mass. 703, 710-711 (2017).  The question before the jury was whether the Commonwealth had proven beyond a reasonable doubt that the two men stopped on the street were the two men in question.  The generic description of dark clothing was, alone, insufficient to prove that the defendant was one of the culprits beyond a reasonable doubt.  Cf. Commonwealth v. Cheek, 413 Mass. 492, 496 (1992); Commonwealth v. Warren, 475 Mass. 530, 535-536 (2016); Commonwealth v. Meneus, 476 Mass. 231, 237 (2017).

---

[5] The Commonwealth must prove beyond a reasonable doubt that the defendant (1) possessed "an engine, machine, tool or implement"; (2) "adapted and designed for cutting through, forcing or breaking open a building"; (3) "in order to steal therefrom money or property, or to commit any other crime"; (4) "knowing the same to be adapted and designed for the purpose aforesaid"; (5) "with intent to use or employ or allow the same to be used or employed for such purpose."  G. L. c.  266, § 49; Commonwealth v. Squires, 476 Mass. 703, 708 (2017).

[6] It matters not which man "jimmied" the door and which man served as lookout.  See Commonwealth v. Fuentes, 45 Mass. App. Ct. 934, 935 (1998), quoting from Commonwealth v. Ward, 45 Mass. App. Ct. 901, 902 (1998) ("[A] person who acts as a lookout while others are engaged in a criminal enterprise can be convicted on a joint enterprise theory.")

Given the vagueness of the description, neither the amount of time that had passed, the distance from the scene, nor the lateness of the hour add appreciably to the calculus on their own or in combination, without more. Cf. Warren, supra; Meneus, supra.

The screwdriver is the evidence upon which the jury also must rely to link the defendant to the store.[7] The jury were permitted to infer from the photographs that the screwdriver fit the marks on the door. The remaining question was whether the screwdriver could be linked to the men. This presents an admittedly close question, but we conclude that the jury were permitted to draw that inference.

The officer testified that he heard somebody drop a metallic object, and that the sound came from where the two men were walking. It was 1:45 A.M., cold, and the officer saw no one else on the street. The officer drove past, turned around, and spoke to the men some twenty-five to thirty feet from where he heard the metallic sound. Responding officers found the screwdriver twenty-five to thirty feet away from where the defendant was standing with the officer, in just the place the officer said he heard something fall.

---

[7] A screwdriver may be a burglarious tool, depending on its use, the surrounding circumstances, or both. See Commonwealth v. Jones, 355 Mass. 170, 176-177 (1969).

From this evidence the jury were permitted to infer that one of the two men dropped the screwdriver. The defendant argues that the evidence was insufficient because the officer did not see either man dispose of the screwdriver. There was no objection to the officer's testimony that he heard "somebody drop some kind of metallic object." The testimony was therefore admitted for all purposes, and the jury were entitled to give it whatever probative weight they deemed appropriate.[8] See Abraham v. Woburn, 383 Mass. 724, 726 n.1 (1981); Commonwealth v. Mercado, 456 Mass. 198, 208 n.21 (2010). See generally Mass. G. Evid. § 103(a)(1)(2017).

The act of possessing and then disposing of the screwdriver suffices to prove that "the defendant knowingly participated in the commission of the crime charged . . . with the intent required for that offense." Commonwealth v. Garcia, 470 Mass 24, 30-31 (2014), quoting from Commonwealth v. Norris, 462 Mass. 131, 138-139 (2012). Contrast Commonwealth v. Romero, 464 Mass. 648, 659 n.9 (2013). The jury could infer that one of the men dropped the screwdriver in order to cover up their participation in the attempted break-in. See Commonwealth v. Ronayne, 8 Mass. App. Ct. 421, 424-425 (1979). This inference, coupled with the fact that the jury were permitted to find that the screwdriver

---

[8] It is unclear how the officer could have "heard" that the metal object was dropped, not kicked, but this went to the weight of the evidence.

fit the pry marks found on the door,[9] the similarity in the clothing, and the defendant's proximity to the scene, were sufficient to sustain the Commonwealth's burden beyond a reasonable doubt.[10]

2. Showup. The defendant contends that the out of court showup resulted in an identification that should have been suppressed, and that there was not good reason to conduct it. See Commonwealth v. Crayton, 470 Mass. 228, 236 (2014). The defendant carries the burden of proof to show "that the showup was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny [him] due process of law." Commonwealth v. Amaral, 81 Mass. App. Ct. 143, 148 (2012), quoting from Commonwealth v. Martin, 447 Mass. 274, 280 (2006). "If the identification passes muster under this test, then it is for the jury to decide what weight to give to the identification." Ibid.

---

[9] Whether there was a "match" was a proper subject of lay opinion, thus permitting the jury to draw its own conclusion. See Commonwealth v. Molina, 454 Mass. 232, 243-244 (2009). No further foundation was required. See ibid. Here, the prosecutor followed the procedure outlined in Molina, and did not elicit any affirmative testimony from the officer regarding a "match," leaving the ultimate conclusion to the jury, which had the photographs and could make an independent assessment.

[10] The defendant also argues that the evidence of intent to use the screwdriver for burglarious purposes was insufficient. The case was argued and submitted to the jury on the theory that one of the men at the store and the defendant were one and the same. The element of intent was established. See Squires, 476 Mass. at 710-711.

"Relevant to the good reason examination are the nature of the crime involved and corresponding concerns for public safety; the need for efficient police investigation in the immediate aftermath of a crime; and the usefulness of prompt confirmation of the accuracy of investigatory information, which, if in error, will release the police quickly to follow another track." Commonwealth v. Austin, 421 Mass. 357, 362 (1995). The officers had good reason to conduct a show up in the immediate aftermath of the crime, when the witness's memory was fresh and unclouded, and the police still had the opportunity to pursue other avenues if the witness did not identify the men or their clothing.

In addition, the witness identified the clothing, not the men. We agree with the motion judge that the witness's statement was not the result of an unnecessarily suggestive showup procedure. See Commonwealth v. Powell, 72 Mass. App. Ct. 22, 26 (2008). "To the extent that the witness's identification was of those articles as opposed to the defendant, there was an absence of the 'extreme' circumstances required to render such indirect proof of the defendant's guilt fundamentally unfair." Ibid. See generally Amaral, supra at 149. Furthermore, "[t]rial counsel had the opportunity to bring out the weaknesses of the witness's identification on cross-examination." Powell, supra at 26. "Any degree of suggestiveness went to the weight of the identification, not its admissibility." Ibid.

3.  Closing argument.  The defendant contends that the prosecutor referred to facts not in evidence during the closing argument by claiming that the defendant had a crow bar, which he disposed of when he fled the scene.  There was no objection at trial.  We review these claims for error, and if there was error, for a substantial risk of a miscarriage of justice.  See Commonwealth v. Randolph, 438 Mass. 290, 297 (2002).

There was no error in the prosecutor's reference to the crow bar during closing arguments.  The witness testified at trial that he saw a man "hitting the door with . . . a pipe or a crow bar."  The prosecutor's statements were supported by the record and he could therefore argue "the evidence and the fair inferences which can be drawn from the evidence."  Commonwealth v. Braley, 449 Mass. 316, 329 (2007), quoting from Commonwealth v. Hoffer, 375 Mass. 369, 378 (1978).  That the men disposed of the bar or crowbar was a fair inference that could be drawn from the evidence.  See Commonwealth v DeCicco, 44 Mass. App. Ct. 111, 118-119 (1998).

The prosecutor also argued that the men ran from the scene, and disposed of the crow bar while they did so.  There was evidence that the men left the scene, but no evidence that the men ran from the scene.  It was error for the prosecutor to make the argument to the jury.  However, there was no substantial risk of a miscarriage of justice.  During the jury charge, the

trial judge informed the jury that closing arguments were not evidence.  Commonwealth v. Johnson, 463 Mass. 95, 114 (2012).  "These instructions, to which we presume the jury adhered, see Commonwealth v. Amirault, [404 Mass. 221, 240 (1989)], effectively neutralized any prejudice produced by the prosecutor's [error]."  Johnson, supra.

Judgment affirmed.

MILKEY, J. (dissenting).  I agree with many of the majority opinion's thoughtful conclusions, including its assessment that whether the Commonwealth's evidence here was sufficient is a close question.  However, in the final analysis, I disagree that the evidence, taken together with reasonable inferences drawn therefrom, could add up to proof of the defendant's guilt beyond a reasonable doubt.  I therefore respectfully dissent.

Background.  Viewed in the light most favorable to the Commonwealth, the trial evidence was as follows.

At approximately 1:45 in the morning, a Newport, Rhode Island police officer who lived in Fall River, awoke to the sound of banging.  He looked out his window to observe two men in the process of trying to break into a convenience store across the street from him.  One of the men was striking the right side of the store's front door (near its latch) using a tool that the eyewitness described as "a crow bar or pipe or something."  The other man was acting as lookout.  The eyewitness could not see the men's faces, and he did not describe their physical characteristics in any material way.[1]  He was able to see the men's clothing, which he described as

_____

[1] The eyewitness did say that one of the men was "taller" and the other man "shorter" (something that would be true almost by definition).  There was no evidence admitted about the defendant's height, or that of the other man charged.

"dark." He provided no further detail -- before or during the trial -- as to what the clothing looked like.

The eyewitness contacted the Fall River police as soon as he began observing the incident, although the two men abandoned their endeavor and walked away before a responding police officer arrived at the scene. After learning from the eyewitness that the men were wearing dark clothing, the officer put out a bulletin for the two men. A different officer who had heard the bulletin drove around the area looking for them. Some ten minutes after that, and within twenty minutes of the incident, that officer spotted the defendant and another man walking along the street about one-half mile from the convenience store. At that point, the men were walking toward St. Anne's Hospital, which was approximately one hundred yards away.

According to the officer, as he passed them in his cruiser, he "heard somebody drop some kind of a metallic object, like a hard object fell to the ground." This prompted him to stop the men for further inquiry. The men told the police officer that they were on their way to the hospital. A subsequent search of the area turned up a screwdriver in the location where the defendant and his companion had been walking when the officer heard the sound. A six-inch flashlight was found on one of the two men.

The police then brought the men back to the scene of the incident for a showup identification procedure.  The eyewitness was placed in the rear of the cruiser, and the two men, in handcuffs, were shown to him illuminated by spotlight.[2]  Because of the limited nature of what he was able to observe during the incident, the eyewitness addressed only the similarity of the suspects' clothing to that of the men he previously had observed.  Specifically, he testified at trial that "I told [the police] that the individuals that they had brought out were the individuals that were -- were wearing the exact same clothing as the individuals out front of the business."  Over the defendant's objection, a police officer was asked about what the eyewitness said at the showup, and he testified that the eyewitness said, "that's definitely the -- the clothing that the suspects were wearing."

Just as the eyewitness provided no information about the clothing worn by the two men he had observed during the incident (other than it was "dark"), he provided no description of what the two suspects shown to him were wearing.  Nor did he offer any explanation about how he discerned that this was "the exact

---

[2] At the motion to suppress hearing, a police officer described the manner in which the defendant was shown to the eyewitness as follows:  "I illuminated him with the take down lights and the spotlight on my cruiser."  The fact that the defendant was handcuffed during the showup procedure came out only at trial.

same clothing as" those he had observed earlier. The officer who had initiated contact with the defendant provided a general description of what the two suspects were wearing, stating "that they had like, you know, like hooded sweatshirts on and jackets" that "were dark colors, if they were black or navy blue, I'm not certain." In his summation, the prosecutor characterized the eyewitness's testimony as stating that the defendant and his companion's clothing "exactly matched" the clothing that the eyewitness had seen during the incident.

An officer described damage that he observed to the front door of the convenience store. This included a softball-sized hole that had been created near the handle to the door (the area where the eyewitness had seen the men "working" the door). There were also some stray marks that could be seen elsewhere on the door. The jury were shown two close-up photographs of some of the damage. Visible in these photographs is a portion of the screwdriver found near the suspects (the head of the screwdriver and some of its shaft), which the police had placed so that the screwdriver's tip could be compared to two of the marks on the door (as will be discussed in detail below). Based on what is shown in the photographs, the prosecutor argued in his summation that the screwdriver "matches perfectly with those pry marks [o]n that door."

Discussion.  The conviction here was for possession of a burglarious tool.  "Where, as here, the tools or instruments possessed by the defendants are not by their nature burglarious, the Commonwealth must establish proof of the defendants' intent to use the tools or instruments for burglarious purposes." Commonwealth v. Squires, 476 Mass. 703, 708 (2017).  Here, the Commonwealth sought to prove such intent through demonstrating that the defendant and his companion were the same two men who had attempted to break into the convenience store earlier that night.  As confirmed by the prosecutor's closing argument, the prime evidence on which the Commonwealth relied to link the defendant to the crime scene was that the suspects' clothing "exactly matched" the clothing that the eyewitness had seen during the attempted break in, and that the screwdriver found near the defendant "matches perfectly with" the damage to the door of the store.  For the reasons that follow, the seeming certitude offered by claims of such "matches" wilts under scrutiny.  Before turning to whether the inculpatory evidence, as a whole, could support a guilty verdict beyond a reasonable doubt, I address the key individual pieces of such evidence.

1.  Evidence linking the defendant to the crime scene.  a. Proximity of place and time.  For reasons that the majority opinion well explains, the fact that, ten to twenty minutes after the incident at the convenience store, the defendant and

another were spotted walking along a street one-half mile away is of negligible evidentiary moment. See Commonwealth v. Warren, 475 Mass. 530, 536-538 (2016); Commonwealth v. Meneus, 476 Mass. 231, 237 (2017). I add only one point. The fact that when the defendant and his companion were stopped, the two men were observed walking toward St. Anne's Hospital, which was a short distance away, is something that can be considered in assessing the sufficiency of the evidence. See Commonwealth v. Oyewole, 470 Mass. 1015, 1017 (2014) (in assessing the sufficiency of the evidence, reviewing courts can take into account uncontested evidence that cuts against a defendant's guilt).[3]

   b. Similarity of clothing. The defendant maintains that the eyewitness's statement about the clothing he and his companion were wearing should have been excluded because it was the product of an overly suggestive identification procedure. Although the procedure used here does give me some pause (a showup during which the men were presented to the eyewitness wearing handcuffs and put under a spotlight), I agree with the majority that the use of such a procedure passes muster under

_____

   [3] The issue in Oyewole had to do with the sufficiency of the proof that that defendant had been notified that his driver's license had been suspended. In concluding that the evidence of this was insufficient, the court found it significant that the defendant was in possession of his license when police stopped him.

existing case law.  See Commonwealth v. Crayton, 470 Mass 228,
236 (2014); Commonwealth v. Amaral, 81 Mass. App. Ct. 143, 148
(2012).

In my view, there are two more fundamental problems with
the eyewitness's testimony.  First, his stated conclusion that
the clothing was "exactly the same" amounts to an improper lay
opinion.  See Commonwealth v. Molina, 454 Mass. 232, 243 (2009)
("Lay witnesses are allowed to testify only to facts that they
observed and may not give an opinion on those facts").  Second,
the eyewitness was allowed to opine that the men were wearing
"the exact same clothing" even though an evidentiary foundation
for such an opinion was never supplied.[4]  As a result, the jury
heard facially powerful identification evidence without their
being given any means of evaluating the witness's basis for
drawing his conclusion.[5]

---

[4] The eyewitness had surveillance cameras installed at his
home, and a video showing the two men attempting to break into
the store was shown to the jury.  No useful information about
what the men or their clothing looked like can be gleaned from
the video.  Accordingly, the video, at a minimum, provides no
affirmative support for the eyewitness's ability to make
detailed observations about the clothing the men were wearing.

[5] The problem was compounded by the manner in which the
prosecutor previewed the evidence in his opening statement.
Without objection, he used the misleading shorthand that the
eyewitness was "able to identify these two individuals by their
clothing that they were wearing."  The prosecutor made that
statement even though -- relying on Crayton, supra -- the judge
had ruled on a pretrial motion to suppress that the eyewitness
"was unable to identify [the defendant] the night of the

Of course, even if such testimony should have been excluded, we are to consider it when assessing the sufficiency of the evidence "without regard to the propriety of [its] admission." Commonwealth v. Sepheus, 468 Mass. 160, 164 (2014), quoting from Commonwealth v. Farnsworth, 76 Mass. App. Ct. 87, 98 (2010). However, this does not mean that the competency of such evidence is beside the point. As we recently said, "any unobjected-to statement admitted at trial is only worth what it is worth." Commonwealth v. Drapaniotis, 89 Mass. App. Ct. 267, 274 (2016) (unobjected-to hearsay testimony that gun salesman had represented a firearm worked held insufficient to prove its operability).[6]

_____

incident and he would not be permitted to identify the [d]efendant at trial." In any event, there is a subtle but important distinction between a witness's, on one hand, commenting on the similarity of a defendant's clothing to that of a perpetrator, and, on the other, "identifying a defendant" by his clothing. As the case before us illustrates, although the case law draws a doctrinal distinction between identifications of people and identifications of inanimate objects, see Commonwealth v. Thomas, 476 Mass. 451, 464-468 (2017), and cases cited, the boundary between those types of identifications can be quite blurred in practice.

[6] It often has been said that "it is for the jury to determine what weight to give" particular evidence." Commonwealth v. Moquette, 439 Mass. 697, 703 (2003). However, that truism does not mean that appellate judges are required to blind ourselves to profound deficiencies in the admitted evidence when we carry out our role of reviewing what reasonable inferences rational jurors could draw from that evidence, and whether such inferences are enough to support a verdict of guilty beyond a reasonable doubt. Thus, the presence of some evidence supporting a defendant's guilt does not end the

The principal inference that the jury could draw from the testimony about the clothing was that the suspects brought before the eyewitness and the men he had observed earlier were wearing dark hooded sweatshirts and jackets. By itself, this provided negligible import. See Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) (statement that perpetrator, like defendant, was wearing three-quarter length black down goose jacket did not supply police even with reasonable suspicion to make investigative stop, absent evidence that jacket was unusual or distinctive). Cf. Commonwealth v. Bresilla, 470 Mass. 422, 425, 429-431 (2015) (rejecting challenge to showup procedures through which numerous eyewitnesses identified distinctive "light brown leather jacket with fur collar and fur cuffs" as jacket shooter was wearing). The additional information the jury were told -- that the eyewitness had concluded that the two sets of clothing looked identical for reasons he never explained -- added incremental value at best.

---

sufficiency analysis. Rather, as the Supreme Judicial Court has recently reaffirmed, "[m]ore than slight evidence must support each essential element, and 'a conviction may not rest upon the piling of inference upon inference or conjecture and speculation.'" Commonwealth v. Grassie, 476 Mass. 202, 207 (2017), quoting from Commonwealth v. Reaves, 434 Mass. 383, 390 (2001). See Sepheus, supra at 167-168 (appellate court conducting sufficiency analysis examining force of inferences that can be drawn from admitted evidence and absence of evidence).

c. <u>Evidence linking the screwdriver found near where the defendant was walking to the crime scene</u>. The eyewitness never stated that the two men at the convenience store were using, or otherwise possessed a screwdriver. In fact, his description of the tool that he observed them using suggests that it was not a screwdriver.[7] Nevertheless, the Commonwealth suggested it had conclusive forensic proof to match the screwdriver to the damage caused at crime scene. Like the proof that the clothing provided an exact match, the evidence linking the screwdriver to the crime scene amounts to far less than first appears.

The screwdriver itself was not introduced in evidence, although, as noted, a small portion of it is shown in the two photographs that were taken of some of the damage to the front door of the convenience store. From all that is shown in these photographs, it appears to be an ordinary flat-head screwdriver. Nothing in the photographs, or the trial testimony, indicates that it has any distinctive features.[8]

---

[7] Strictly speaking, the phrase "a crow bar or pipe or something" is broad enough to encompass a screwdriver. Notably, the Commonwealth never took the position that the tool that the eyewitness observed was the screwdriver later found. To the contrary, the prosecutor argued that the men had both a crow bar and the screwdriver, and that they must have discarded the crow bar before they were stopped by the police.

[8] One witness made a single, passing reference to it as "a long screwdriver." No scale is indicated in the close-up photographs that show parts of the door and screwdriver.

One of the two photographs shows a small lateral gash in the metal covering of the door. A rational juror could have concluded that the gash to the metal was a pry mark that someone had caused using an implement such as a pry bar, a chisel, or, indeed, a screwdriver. In that photograph, the screwdriver found near where the defendant was walking is being held up to the surface of the door, with its tip inserted into the gash. The tip appears to fit snugly there, and it is based presumably on that happenstance that the prosecutor argued to the jury that the screwdriver "matches perfectly with those pry marks [o]n that door."[9] For the reasons set forth below, the exactitude claimed by the prosecutor is unsupported by the evidence. Yet, the "superficial plausibility of the prosecutor's argument [linking the defendant to the crime] masked its profound flaws." Commonwealth v. Ferreira, 460 Mass. 781, 788 (2011), quoting

---

[9] No witness testified to the match; it was solely the prosecutor who spoke to the issue in his closing. As a result, the defendant had no opportunity to challenge the foundation for the assertion that the screwdriver "perfectly matched" some of the damage to the door, or to test that assertion through cross-examination. Cf. Commonwealth v. Ferreira, 460 Mass. 781, 786-787 (2011) (finding error in prosecutor's raising probability argument related to witness identification in his closing argument, in part based on need to have such claim established through witness testimony). Indeed, given that, by Massachusetts tradition, the prosecutor's closing went last, the defendant did not even have an opportunity to respond to the "perfectly matches" claim in his own closing argument.

from Commonwealth v. Ferreira, 77 Mass. App. Ct. 675, 685 n.6 (2010) (Milkey, J. dissenting).[10]

The screwdriver, like other ordinary flat-head screwdrivers, has a tapered head, with the narrowest point being the very end (that is, where the tip is designed to meet a screw). As a matter of simple geometry, so long as their tips were not wider than the gash, screwdrivers of various sizes readily could appear to fit snugly into the gash (and thus seem to "match[] perfectly"). Thus, all that the staged photo of the screwdriver inserted into the gash really shows is that the

---

[10] The Supreme Judicial Court on many occasions has recognized the power of claims that evidence linked to a defendant "matches" evidence of the crime, and it has taken appropriate steps to limit how such claims are presented to a jury. Thus, for example, a ballistics expert may express his opinion that a bullet was fired by a particular gun "to a reasonable degree of ballistics certainty" if the expert is able to "identif[y] sufficient individual characteristic toolmarks" supporting such a match, but the expert may not use phrasing that connotes a higher degree of certitude. Commonwealth v. Pytou Heang, 458 Mass. 827, 848-849 (2011). See generally Mass. G. Evid. § 702 note, at 153 (2017) (reviewing case law regarding expert opinions that are "empirically based but subjective in nature"). Where statistical analysis is available to set forth the significance of a purported match, that analysis must accompany the opinion. See Commonwealth v. Mattei, 455 Mass. 840, 850 (2010), quoting from Commonwealth v. Curnin, 409 Mass. 218, 222 n.7 (1991) ("[I]n a criminal trial we will 'not permit the admission of test results showing a DNA match [a positive result] without telling the jury anything about the likelihood of that match occurring'"). As has been explained, "[e]vidence of a match based on correctly used testing systems is of little or no value without reliable evidence indicating the significance of the match." Commonwealth v. Rosier, 425 Mass. 807, 813 (1997).

screwdriver could not be ruled out as a potential source of that damage.

The other photo reinforces this point.  That photo plainly shows that the end of the tip of the screwdriver is appreciably smaller than the lateral indentation that appears there (which was in what appears to be a wooden portion of the door or door frame).  It is, of course, still entirely possible that the screwdriver was used to make that mark, even though it could not fairly be characterized as a "perfect match."  Taken together, the two photos demonstrate that the existence of a perfect match between the implement and the damage it allegedly caused is neither necessary nor sufficient to prove that it caused such damage.

In addition, there was no testimony from the proprietor of the store or anyone else as to when the gash was made.  Nor is there anything in the photographs that suggests that this damage was fresh.  The absence of any evidence regarding the state of the door prior to the incident, at a minimum, substantially reduces any inculpatory value provided by the evidence linking the screwdriver to the crime scene.[11]  See Commonwealth v.

---

[11] To address that point at trial, the prosecutor argued that the jury could conclude that the damage to the door must have just occurred because no reasonable store proprietor would leave such damage unaddressed.  That argument has a great deal of force with regard to the softball-size hole in the door by its handle, the very area where the eyewitness observed one of

Renaud, 81 Mass. App. Ct. 261, 264 (2012) (presence of defendant's electronic banking card at crime scene "cannot allow a factfinder to conclude beyond a reasonable doubt that the owner of that card was in possession of it during the commission of a crime").  Cf. Commonwealth v. French, 476 Mass. 1023, 1024 (2017), quoting from Commonwealth v. Fazzino, 27 Mass. App. Ct. 485, 487 (1989) (evidence held insufficient where defendant's fingerprint found near window at scene of break-in was only evidence linking him to crime, and there was no proof "which reasonably excludes the hypothesis that the fingerprint[] w[as] impressed at a time other than when the crime was being committed").

2.  <u>Evidence that the defendant possessed and sought to discard a screwdriver</u>.  As noted, the officer who spotted the defendant and his companion walking toward St. Anne's Hospital testified that he "heard somebody drop some kind of a metallic object, like a hard object fell on the ground."  The officer had not seen the men carrying anything before this, and it is, of course, impossible for one -- by ears alone -- to "hear[]

---

the men repeatedly striking the door.  It has minimal, if any, force with regard to the small gash in the metal covering to the door that was found in a different location (near the bottom corner of the door).  Moreover, the chance that the gash there was made at a different time is strengthened by testimony from the eyewitness that he frequently had to call the local police to respond to all the crime he observed outside his window.

somebody drop" something.[12] Nor did the officer explain why he believed the men must have "drop[ped] some kind of metallic object," as opposed, say, to having kicked it. Nevertheless, because we are bound in this context to view the evidence in the light most favorable to the Commonwealth, I accept that rational jurors could have inferred that the sound the officer heard was that of the men dropping the screwdriver found at the spot where they had been walking.

I further accept that the dropping of the screwdriver could be taken as some evidence of consciousness of guilt, that is, that the defendant and his companion had possessed the screwdriver with a nefarious intent. At the same time, the force of such an inference is hardly as compelling as the majority opinion suggests, especially when it is stripped of the untenable claim that the screwdriver matches perfectly with the crime scene. The tenuousness of any claim of consciousness of guilt is illustrated by viewing such an argument in its full context. Under the Commonwealth's theory of the case, the men had both a crow bar and a screwdriver at the store, and they discarded the crow bar once they left the scene in order to hide evidence linking them to the crime. Then, having initially decided to retain possession of the screwdriver, the men

---

[12] The lack of an objection to such testimony does not require us to accept it at face value. See Drapaniotis, 89 Mass. App. Ct. at 274.

realized their error in doing so at the very instant that the officer drove by them.  As a result, they at that moment discarded the screwdriver in a manner that the officer could hear from inside his car.

Without any significant evidence linking the defendant or the screwdriver to the crime scene, the question then is whether the mere discarding of the screwdriver was enough to establish the defendant's intent to use it, an ordinary household item, for burglarious purposes.  In my view, relying on the discarding of the screwdriver to demonstrate such intent comes at least close to violating the principle that juries may not convict a defendant based on consciousness of guilt alone.  See Commonwealth v. Toney, 385 Mass. 575, 585 (1982).

3.  Evidence as a whole.  Of course, a reviewing court in the end must consider the totality of incriminatory evidence taken together, not view individual pieces in isolation.  "As Justice Holmes observed long ago, '[e]vidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and in turn may corroborate the conclusion which would be drawn from the other facts.'" Commonwealth v. Norman, 87 Mass. App. Ct. 344, 347 (2015), quoting from Commonwealth v. Mulrey, 170 Mass. 103, 110 (1898).

Here, the jury heard evidence that:  a) the defendant and another man were found walking one-half mile from the site where

two men had been observed ten or twenty minutes earlier pounding the door of a store with "a crow bar or pipe or something," b) the sets of men wore dark hooded sweatshirts and jackets that an eyewitness opined -- without explanation -- was the "exact same clothing," c) the two suspects dropped a screwdriver as they were passed by a police officer and were then found in possession of a flashlight, and d) the screwdriver that the men dropped could not be ruled out as the source of certain marks on the door that may or may not have been made that night.  Taking this evidence as a whole, I agree that a rational juror could conclude that the defendant and his companion likely were the same two men that the eyewitness had observed at the scene, and therefore that the defendant likely had been in possession of a tool that he intended to use for burglarious purposes.

However, the real question we face is whether a rational juror could take such evidence as proof of the defendant's guilt beyond a reasonable doubt, that is, proof that supplied "an abiding conviction, to a moral certainty, of the truth of the charge."  Commonwealth v. Webster, 5 Cush. 295, 320 (1850).  In my view, given how thin the Commonwealth's proof actually was, the answer to that question is "no."  The Commonwealth's case ultimately rests on only "slight evidence" and "upon the piling of inference upon inference or conjecture and speculation."  See

Commonwealth v. Grassie, 476 Mass. 202, 207 (2017), quoting from Commonwealth v. Reaves, 434 Mass. 383, 390 (2001).